288

136 A.3d 134

Jessica MARKHAM, Victoria Markham, Jesse Charles, Pennsylvania Homecare Association, United Cerebral Palsy of Pennsylvania

v.

Thomas W. WOLF, in his Official Capacity as Governor of the Commonwealth of Pennsylvania, Department of Human Services, Office of Long Term Living.

Appeal of President Pro Tempore Senator Joseph B. Scarnati, III, Majority Leader Senator Jake Corman, Majority Whip Senator John Gordner and Majority Appropriations Chairman Senator Pat Browne, on Behalf of the Pennsylvania Senate Majority Caucus, Possible Intervenors.

David W. Smith and Donald Lambrecht

v.

Governor Thomas W. Wolf, in his Official Capacity as Governor of the Commonwealth of Pennsylvania and Commonwealth of Pennsylvania, Department of Human Services.

Appeal of President Pro Tempore Senator Joseph B. Scarnati, III, Majority Leader Senator Jake Corman, Majority Whip Senator John Gordner and Majority Appropriations Chairman Senator Pat Browne, on Behalf of the Pennsylvania Senate Majority Caucus, Possible Intervenors.

Supreme Court of Pennsylvania.

Argued Oct. 7, 2015.

Resubmitted Jan. 20, 2016.

Decided March 29, 2016.

290

Joel L. Frank, Esq., Maureen Murphy McBride, Esq., James C. Sargent Jr., Esq., Scot Russel Withers, Esq., Lamb McErlane, PC, West Chester, for President Pro Tempore Senator Joseph B. Scarnati, III, et al.

Bruce Richard Beemer, Esq., Kenneth Lawson Joel, Esq., Sean Andrew Kirkpatrick, Esq., Maryanne Mueller Lewis,

Esq., Pennsylvania Office of Attorney General, Denise Joy Smyler, Esq., Philadelphia, for Thomas W. Wolf in Official Capacity as Gov. of Comm. of PA, Dept. of Human Svcs., Ofc. of Long Term Living.

Jason Gantcliffe Benion, Esq., John Walter Dornberger, Esq., Cynthia A. Haines, Esq., James John Kutz, Esq., Paula Gayle Sanders, Esq., Post & Schell, P.C., Harrisburg, for Jessica Markham, Victoria Markham, Jesse Charles, PA Homecare Assoc., United Cerebral Palsy of PA.

David Randel Osborne, Esq., for David W. Smith and Donald Lambrecht.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.

## OPINION

Justice TODD.

In this interlocutory appeal, we consider whether state legislators have standing to intervene in a challenge to the issuance of an executive order concerning direct care health workers. For the reasons that follow, we conclude that, in these circumstances, they do not because the legislators' interests purportedly impacted by the executive order do not involve unique legislative prerogatives, but, rather, are interests common to the general citizenry which only remotely impact the legislators' right to act as legislators. Thus, we affirm the order of the Commonwealth Court denying the legislators' request to intervene.

The background to this appeal is uncontested. On February 27, 2015, Governor Tom Wolf issued Executive Order 2015–05, "Participant–Directed Home Care Services" ("Executive Order 2015–05" or "Executive Order"), which focuses on individuals who receive, and workers who provide, in-home medical and personal care. The Executive Order establishes, *inter alia,* an advisory group to ensure the quality of long-term personal assistance services to seniors and persons with disabilities, and a process by which workers who provide such

care, and who are employed by the individuals they serve, may obtain a designated representative for discussions with the Secretary of Human Resources regarding various matters including, *inter alia*, wages and health and retirement benefits.

On April 6, 2015, Jessica Markham, Victoria Markham, Jesse Charles, Pennsylvania Home Care Association, and United Cerebral Palsy of Pennsylvania filed a Petition for Review in the Commonwealth Court's original jurisdiction pursuant to 42 Pa.C.S. § 761(a)(1), naming as respondents Appellees Governor Wolf and the Commonwealth of Pennsylvania, Department of Human Services, and the Office of Long Term Living. These petitioners asserted that Executive Order 2015–05 establishes organizational labor rights for domestic home care workers, but was issued without authorization and conflicts with existing Commonwealth labor laws—specifically, the Pennsylvania Labor Relations Act,[1] and the Public Employe Relations Act.[2] Similarly, on the same date, David Smith and Donald Lambrecht (collectively, with Jessica Markham, Victoria Markham, Jesse Charles, Pennsylvania Home Care Association, and United Cerebral Palsy of Pennsylvania, "Petitioners") also filed a Petition for Review in the Commonwealth Court, naming Appellees as respondents. They similarly challenged Executive Order 2015–05.

On April 20, 2015, Senate President Pro Tempore Joseph Scarnati, III, Senate Majority Leader Jake Corman, Senate Majority Whip John Gordner, and Senate Majority Appropriations Chairman Pat Browne, on behalf of the Pennsylvania Senate Majority Caucus ("Appellants"), filed an Application for Relief Seeking to Intervene ("Application to Intervene") in both actions,[3] claiming Executive Order 2015–05 was an unau-

---

1. Act of June 1, 1937, P.L. 1168, No. 294, §§ 211.1–211.12, *as amended*, 43 P.S. §§ 211.1–211.13.

2. Act of July 23, 1970, P.L. 563, No. 195, §§ 101–2301, *as amended*, 43 P.S. §§ 1101.101–1101.2301.

3. As explained by Appellants, the Pennsylvania Senate organizes its members according to the two major political parties, Republican and Democratic. The two subordinate organizations which make up the Senate, Majority and Minority, are known as the Senate "caucuses."

thorized attempt by the Governor to exercise legislative power in violation of the separation of powers doctrine.

Two days later, the Commonwealth Court conducted a hearing on Petitioners' request for a preliminary injunction, conducted by President Judge Dante Pellegrini. Initially, the court rejected Appellants' attempt to directly intervene at the preliminary injunction stage. However, the court issued an order enjoining Governor Wolf from entering into any memorandum of understanding pursuant to Executive Order 2015-05 until disposition of the matter on the merits, establishing an expedited schedule for the filing of briefs on preliminary objections and cross-motions for summary relief, and listing the matter for *en banc* argument before the Commonwealth Court in September 2015.

On May 28, 2015, President Judge Pellegrini heard oral argument on Appellants' Application to Intervene, and, by a single judge opinion, he denied Appellants' application on June 3, 2015. Noting the traditional test for standing—requiring an individual to be aggrieved, i.e., to have a substantial, direct, and immediate interest in the outcome of the litigation—President Judge Pellegrini considered caselaw analyzing standing for legislators. Observing that legislative standing rests upon a concrete injury suffered in the legislator's official capacity, rather than a mere generalized grievance about the conduct of government that all citizens share, President Judge Pellegrini concluded that the interests impinged by the Governor were not unique, legislative interests, but, rather, were interests common to the general citizenry. In reaching this conclusion, he determined that, at its core, Appellants' "sole basis for seeking intervention is that the Governor's Executive Order is illegal and that every time he takes an illegal action, he violates separation-of-powers principles because he is not

While the Pennsylvania Constitution does not employ the term "caucuses" to describe the organization of the Senate, the Majority Caucus and Minority Caucus are the two constituencies that comprise the Senate. Of course, the party that holds the most seats in the Senate is considered to be the "Majority Caucus." Appellants' Brief at 1–2 n. 1; *see Precision Marketing Inc. v. Commonwealth, Republican Caucus of the Senate of Pennsylvania*, 78 A.3d 667, 672 (Pa.Cmwlth.2013).

enforcing the laws that the [Appellants] believe are proper." *Markham v. Commonwealth*, 176 M.D.2015, at 9 (Pa.Cmwlth. filed June 3, 2015). The judge further explained that legislators do not have standing just because the Governor's action is purportedly illegal, and the General Assembly may "offer legislation that will preclude or vitiate the Governor's action." *Id.* Nevertheless, Appellants were permitted to participate, and subsequently participated, in the matter as *amicus curiae*. *Id.* at 10 n. 8.

On July 6, 2015, Appellants filed a notice of appeal with our Court, as well as jurisdictional statements and applications seeking expedited consideration of the appeals. On August 10, 2015, our Court noted probable jurisdiction and granted the applications for relief seeking expedited consideration.[4] Oral argument was held before our Court on October 7, 2015.[5]

The issue before our Court, as stated by Appellants, is "Whether legislative standing exists to challenge an executive order the origin of which has neither been authorized by the Constitution nor promulgated pursuant to statutory authority, thus constituting a violation of the Separation of Powers doctrine?" Appellants' Brief at 5. As this issue raises a pure question of law, our standard of review is *de novo*, and our scope of review is plenary. *In re Hickson*, 573 Pa. 127, 821 A.2d 1238, 1242 (2003).

Appellants maintain that Executive Order 2015–05 is an "unqualified and improper intrusion upon one branch by another," and constitutes a "discernable and palpable infringement" on the legislators' authority as legislators. Appellants' Brief at 13. Analyzing prior caselaw on legislative standing, Appellants offer that legislators have "standing to challenge executive actions when specific powers unique to their func-

4. We have jurisdiction over Appellants' appeal from the Commonwealth's order pursuant to Pa.R.A.P. 313. *See In re The Barnes Foundation*, 582 Pa. 370, 871 A.2d 792, 794–95 (2005) (holding order denying intervenor status immediately appealable under collateral order doctrine).

5. In the interim, the Commonwealth Court postponed oral argument before the court *en banc,* which, as noted above, was scheduled to be heard in September 2015.

tions under the Constitution are diminished or interfered with." Appellants' Brief at 16 (citing *Wilt v. Beal*, 26 Pa. Cmwlth. 298, 363 A.2d 876, 876 (1976)). Stated another way, they assert that generalized grievances about the conduct of government do not bestow standing, but that claims that assert a legislator's vote or official authority has been impaired or nullified are sufficient to do so. *Fumo v. City of Philadelphia*, 601 Pa. 322, 972 A.2d 487, 502 (2009) (recognizing standing to permit a legislator to obtain redress for an injury suffered in his official capacity). According to Appellants, they have standing for the same reasons presented in *Fumo*, as the Governor violated the separation-of-powers doctrine by infringing upon their exclusive law-making authority and usurping the power of the General Assembly. Appellants' Brief at 18. Appellants further outline various types of executive orders, categorizing Executive Order 2015–05 as implementing law, and argue that only executive orders that are authorized by the Pennsylvania Constitution or promulgated pursuant to statutory authority are enforceable. Appellants contend that Executive Order 2015–05 creates law by allowing direct care health providers a process by which to seek representation and collectively bargain. This, according to Appellants, is neither authorized by the Constitution nor by statute, and violates the separation-of-powers doctrine by allowing the Governor to "circumvent" the General Assembly's exclusive legislative function. Appellants' Brief at 11. Appellants claim Executive Order 2015–05 effectively denies every member of the General Assembly the opportunity to vote on whether direct care health providers may organize and collectively bargain—a procedure Appellants claim is not currently provided for in our labor laws. Contrary to President Judge Pellegrini's assessment, Appellants assert they are not contending that they have standing every time the Governor does something that is allegedly illegal, but, rather, that legislative standing is appropriate when the Governor issues an executive order that is neither constitutionally nor statutorily authorized, and, thus, acts in violation of the separation-of-powers

doctrine.[6]  Thus, Appellants seek reversal of the Commonwealth Court's order denying them intervenor status.

Appellees counter that Appellants' challenge to Executive Order 2015–05 is merely a generalized complaint that the Governor violated the law; thus, Appellants do not satisfy the requirements for standing. Specifically, Appellees first note that, pursuant to the Pennsylvania Rules of Civil Procedure, in order to intervene, individuals must have standing, Pa.R.C.P. 2327(3), (4), and to establish standing, one must have an interest that is substantial, direct, and immediate. Pointing to *Fumo*, Appellees offer that legislators enjoy standing when "a discernable and palpable infringement on their authority as legislators" is present, as compared to a general grievance about the correctness of governmental conduct, about which they do not have standing. Appellees' Brief at 16 (quoting *Fumo*, 972 A.2d at 501). Similarly, pointing to *Wilt*, Appellees maintain that, once a vote has been duly recorded and the bill signed into law, a legislator has no standing to sue in his capacity as a legislator. Appellees' Brief at 16–17 (citing *Wilt*, 363 A.2d at 881). Appellees outline federal decisions which they assert deny standing to legislators who claim that an executive action unconstitutionally usurped their power to legislate, but did not prevent the legislators from voting. Appellees' Brief at 17–20 (citing, *inter alia, Raines v. Byrd*, 521 U.S. 811, 814, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), and *Goode v. City of Philadelphia*, 539 F.3d 311, 316 (3d Cir. 2008)). Thus, according to Appellees, to warrant standing, the injury must be to powers unique to the legislature. Applying this standard, Appellees contend that Appellants merely raise a generalized grievance that Executive Order 2015–05 violates

**6.** Additionally, Petitioners Jessica Markham, Victoria Markham, Jesse Charles, Pennsylvania Home Care Association, and United Cerebral Palsy of Pennsylvania have filed a brief "to provide the Court with additional background in light of the importance of the matter," addressing why, in their view, Executive Order 2015–05 is violative of the Pennsylvania Constitution and in conflict with various statutes. Petitioners' Brief at 1. Likewise, Petitioners Smith and Lambrecht filed a brief in support of Appellants, offering that Appellants could have been joined as original parties pursuant to Pa.R.C.P. 2327 or permitted to intervene to preserve the General Assembly's legislative authority, and, thus, meet the requirements for standing.

state law, and this does not implicate the legislators' power to vote, either by preventing them from voting on legislation or by prohibiting them from passing legislation in the future. Finally, Appellees warn that to find standing here would give Appellants an unlimited ability to challenge any action or inaction by an official or employee of the executive branch, simply by framing the issue as a violation of the separation-of-powers doctrine. Thus, Appellees seek affirmance of the Commonwealth Court's decision.

Initially, it is important to clarify the discrete issue which is before us in this appeal. Whether Executive Order 2015–05 is unconstitutional or in conflict with existing labor and health care laws is not before our Court. Rather, the only issue before us is whether Appellants were properly denied intervenor status, which, as discussed below, turns on whether they satisfy our standing requirements. Thus, as there is no question that Appellants otherwise properly sought to intervene,[7] or that an intervening party must establish standing, we begin our analysis with a review of general principles regarding standing.

In Pennsylvania, a party to litigation must establish as a threshold matter that he or she has standing to bring an action. *Stilp v. Commonwealth,* 596 Pa. 62, 940 A.2d 1227, 1233 (2007). Standing in Pennsylvania is a jurisprudential matter. *City of Philadelphia v. Commonwealth,* 575 Pa. 542, 838 A.2d 566, 577 (2003).[8] In our Court's landmark decision

---

7. Intervention in a civil action is governed by Pa.R.C.P. 2327. Specifically, Rule 2327(3) and (4), "Who May Intervene," provides in relevant part:

   At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if ... (3) such person could have joined as an original party in the action or could have been joined therein; or (4) the determination of such action may affect any legally enforceable interest of such person whether or not such person may be bound by a judgment in the action.

   Pa.R.C.P. 2327(3), (4).

8. In the federal system, by contrast, standing is both constitutional, implicating Article III's case or controversy requirement, and prudential, involving judicial limits on federal jurisdiction. U.S. Const. art.

on standing, we explained that a person who is not adversely impacted by the matter he or she is litigating does not enjoy standing to initiate the court's dispute resolution machinery. *William Penn Parking Garage v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269, 280–81 (1975) (plurality). This is consistent with our jurisprudential approach that eschews advisory or abstract opinions, but, rather, requires the resolution of real and concrete issues. As we explained in *In re Hickson,* 821 A.2d at 1243, the party to the legal action must be "aggrieved."

In determining whether a party is aggrieved, courts consider whether the litigant has a substantial, direct, and immediate interest in the matter. To have a substantial interest, the concern in the outcome of the challenge must surpass "the common interest of all citizens in procuring obedience to the law." *Id.* An interest is direct if it is an interest that mandates demonstration that the matter "caused harm to the party's interest." *Id.* Finally, the concern is immediate "if that causal connection is not remote or speculative." *City of Philadelphia,* 838 A.2d at 577. The "keystone to standing in these terms is that the person must be negatively impacted in some real and direct fashion." *Pittsburgh Palisades Park, LLC v. Commonwealth,* 585 Pa. 196, 888 A.2d 655, 660 (2005).

Standing for legislators claiming an institutional injury is no different than traditional standing and, in order for legislators to bring a particular challenge, the legislators must satisfy the prudential standing criteria offered above. Indeed, our Court in *Pittsburgh Palisades* shied away from a special category of standing for legislators. *Id.* at 662 ("To be clear, by our decision today, we are in no way creating or espousing a special category of standing for legislators."); *see also id.* at 664 (Saylor, J., dissenting) (cautioning against the creation of distinct legislator standing apart from citizen-taxpayer standing).

III; *Elk Grove Unified School District v. Newdow,* 542 U.S. 1, 11–12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004).

Thus, with these general tenets of standing in hand, we turn to consider our Commonwealth's caselaw applying these principles as they relate to legislators. Specifically, almost 40 years ago, in its foundational decision in *Wilt*, the Commonwealth Court addressed what was then an issue of first impression regarding the standing of a legislator. There, William Wilt, a member of the Pennsylvania House of Representatives, sought to enjoin Frank Beal, the Secretary of Public Welfare, and Grace Sloan, the State Treasurer, from operating the recently completed Altoona Geriatric Center as a mental-health-care facility, and to recoup monies expended in the purportedly improper operation of the center. Writing for the court, then-Commonwealth Court judge, later federal district judge, Glenn Mencer first noted federal standing decisions and concluded that they were in general agreement with the principles of standing in Pennsylvania. Reviewing federal decisions involving standing for legislators, the court noted that state senators were entitled to standing to challenge an alleged illegal tie-breaking vote cast by the lieutenant governor because the legislators had a "plain, direct and adequate interest in maintaining the effectiveness of their votes." *Wilt*, 363 A.2d at 880 (quoting *Coleman v. Miller*, 307 U.S. 433, 438, 59 S.Ct. 972, 83 L.Ed. 1385 (1939)). Similarly, the court noted an individual senator had standing to challenge a purported "pocket veto" on the ground he was being denied his right to vote for an attempted override of the veto. *Id.* at 881 (citing *Kennedy v. Sampson*, 511 F.2d 430 (D.C.Cir. 1974)). Conversely, the court observed legislators have been denied standing when merely claiming an action impaired the effectiveness of legislation for which they had an opportunity to vote, and for which their vote was duly registered. *Id.* (citing *Metcalf v. National Petroleum Council*, 407 F.Supp. 257 (D.D.C.1976)).

After consideration of this caselaw, the Commonwealth Court found what emerged was "the principle that legislators, as legislators, are granted standing to challenge executive actions when specific powers unique to their functions under the Constitution are diminished or interfered with. Once,

however, votes which they are entitled to make have been cast and duly counted, their interest as legislators ceases." *Id.* The court offered a hypothetical of such a deprivation through the duty of the Senate to approve or disapprove of certain gubernatorial appointments, and opined that interference with the performance of this duty would be an injury to the members sufficient to give standing. Applying this standard to the facts of the case, the court noted that Wilt's complaint was that "the purpose of the bill for which he had voted has been frustrated, thus, depriving him of the effectiveness of his vote." *Id.* The court rejected that argument, holding that once "Wilt's vote had been duly counted and the bill signed into law, his connection with the transaction *as a legislator* was at an end." *Id.* (emphasis original).

Three years later, in *Zemprelli v. Thornburgh,* 47 Pa. Cmwlth. 43, 407 A.2d 102 (1979), the Commonwealth Court found Senator Edward Zemprelli had standing to enforce the constitutional provision requiring Governor Richard Thornburgh to submit to the Senate nominees to fill vacancies in offices within 90 days of the date the vacancy arose. The senator alleged that the Governor's failure to submit such nominees to the Senate was improper, as it deprived the senators of their right and duty to advise and consent with respect to the appointment of incumbents of public office. Governor Thornburgh filed preliminary objections arguing, *inter alia,* that Senator Zemprelli lacked standing to bring the action. Citing *Wilt* for its protection-of-the-right-to-vote standing standard, as well as the *Wilt* court's hypothetical regarding a senator's standing to seek approval or disapproval of gubernatorial appointments, Judge David Craig, writing for the Commonwealth Court, found the standing question turned on whether the Governor had a legal duty to submit nominations to the Senate within a given time period. After determining that the nomination provision was indeed mandatory, the court reasoned that the Governor's failure to act deprived the senator of his legal interest to advise and consent, and, thus, it conferred standing upon the senator. As in *Wilt,* the Commonwealth Court in *Zemprelli* focused on whether a

legislator's right to vote, or to directly participate in a matter, had been impeded.

Thereafter, in another standing decision involving, among others, Senator Zemprelli, our Court concluded that five senators had standing to challenge the computation of the constitutional majority of Senate members required for the confirmation of LeGree Daniels as a member of the State Tax Equalization Board. *Zemprelli v. Daniels*, 496 Pa. 247, 436 A.2d 1165 (1981). Specifically, Governor Thornburgh nominated Daniels by letter to the Senate on December 24, 1980. The nomination was initially held, but on January 27, 1981, reconsidered, and a vote taken. Under relevant statutory law, 71 P.S. § 67.1(d)(4), a majority of the members "elected" to the Senate were required to confirm Daniels' appointment. Daniels received 25 confirmation votes and 22 votes rejecting her nomination. The President of the Senate, determining that Daniels received a constitutional majority vote, confirmed the appointment. Five senators who voted against the confirmation of Daniels filed a *quo warranto* action seeking to oust Daniels from her seat, arguing that the constitutional majority should have been computed on the basis of the total number of members "elected" to the Senate, 50—rather than on the number then in office, 48. The senators' standing was challenged by the respondents, who alleged the senators were afforded the power to cast their vote in the Daniels' nomination, and, having voted, their special interests ceased. The senators responded that they enjoyed standing as their effectiveness as legislators had been impaired, as their votes were diluted. Concluding that the voting process itself was under attack, the Commonwealth Court reasoned that at least the possibility existed that the senators' interpretation of the constitutional majority requirement "has resulted in some cognizable injury to [the senators] in their legislative capacity," and, thus, the court concluded that the senators had standing. *Zemprelli*, 436 A.2d at 1167.

On appeal, our Court agreed and rejected the argument that the senators' special interests expired upon their voting on the matter. Indeed, Chief Justice Henry O'Brien, writing

for our Court, noted the injury directly related to the voting process itself, and, in rejecting the claim that the senators' interests end upon casting their votes, quipped, "[w]here the voting process itself is not, as here, under attack, this argument might be persuasive." *Id.* We concluded that the Senate President's interpretation of the constitutional majority requirement effectively diluted the legislators' votes by impacting the voting process, and, thus, that the action presented a cognizable injury to the objecting senators in their legislative capacity.

Finally, perhaps the clearest articulation of the distinction between a matter implicating a legislator's direct and substantial interest in the voting process or power to act and one that does not was articulated in our Court's 2009 decision in *Fumo*. In that decision, authored by Chief Justice Ronald Castille, certain state legislators and the City Council of Philadelphia filed petitions for review seeking to challenge the decision of the City of Philadelphia Department of Commerce to issue a license to HSP Gaming, L.P. ("HSP") to construct a portion of its gaming casino on submerged lands in the Delaware River. The state legislators raised two claims of injury. First, they asserted that the Department of Commerce did not have the authority to issue the construction license, but, rather, that the General Assembly had the sole and exclusive authority to grant a legally enforceable interest in, or the license for the use of, submerged lands belonging to the Commonwealth, including those in the Delaware River. Second, the state legislators argued that, in issuing the license, the Department of Commerce failed to adhere to certain property requirements, i.e., the license was issued in an unlawful manner.

As a threshold matter, our Court considered whether the state legislators had standing to bring the action. After review of state and federal caselaw, we explained that "[l]egislators ... have been permitted to bring actions based upon their special status where there was a discernable and palpable infringement on their authority as legislators." *Fumo*, 972 A.2d at 501. We stressed that such standing "has been recognized in limited instances in order to permit the legisla-

tor to seek redress for an injury the legislator ... claims to have suffered in his official capacity, rather than as a private citizen." *Id.* We further opined that standing has been recognized in this context to protect a "legislator's right to vote on legislation" and to protect against a "diminution or deprivation of the legislator's ... power or authority," but has not been recognized in actions "seeking redress for a general grievance about the correctness of governmental conduct." *Id.*

We then turned to apply these tenets of standing to the state legislators' two distinct assertions of injury. As to their first claim regarding the construction license authority, the state legislators maintained that they enjoyed standing because only the General Assembly held the licensing authority, and the Department of Commerce usurped that exclusive licensing authority; they asked our Court to uphold their sole right as legislators to cast a vote or otherwise make a decision on licensing the use of the Commonwealth's submerged lands. *Id.* at 502. Our Court determined that, in light of the alleged exclusive right to vote on this specific licensure, this was the type of claim a legislator, *qua* legislator, had standing to pursue, as it "reflects the state legislators' interest in maintaining the effectiveness of their legislative authority and their vote." *Id.*

The state legislators' second claim challenged the manner in which the license was issued, and, specifically, the breach of an alleged duty to require that HSP provide evidence of deed or title to the submerged lands. Our Court noted that this claim did not "demonstrate any interference with or diminution in the state legislators' authority as members of the General Assembly," and amounted to "nothing more than the state legislators' disagreement with the way in which the Commerce Director interpreted and executed her duties on behalf of the City." *Id.* Our Court reasoned that, as such, the legislators' second claim was in the nature of a generalized grievance regarding the workings of government that all citizens shared, and, thus, the legislators lacked standing to pursue this claim.

More recent statements by our Court regarding legislative standing are consistent with the approach we took in *Fumo*.

*See Robinson Twp. v. Commonwealth,* 624 Pa. 219, 84 A.3d 1054, 1055 (2014) (rejecting standing to legislators as their interest implicated "neither a defense of the power or authority of their offices nor a defense of the potency of their right to vote," but, rather, sought only to offer their perspective on the correctness of governmental conduct regarding the enactment of the relevant statute); *accord Commonwealth v. Neiman,* 624 Pa. 53, 84 A.3d 603, 609 n. 26 (2013) (noting that, while two Justices questioned intervenor status of the General Assembly because "legislators do not have standing to raise a claim in a legal proceeding that the effectiveness of a law which they have passed was impaired by a judicial decision," the issue was not raised).

Recent federal caselaw in this area, which has rejected the assertion of institutional injury as a basis for legislative standing, is entirely consistent with our Commonwealth's approach. Indeed, in *Fumo,* our Court found persuasive the Third Circuit's decision in *Common Cause of Pennsylvania v. Commonwealth,* 558 F.3d 249 (3d Cir.2009). Therein, the court found that a state legislator's claims that the timing and method of the passage of a statute which increased the compensation of state legislators, executive officials, and judges deprived legislators due process and equal protection—premised on the denial of their ability to discuss, debate, and amend the bill before having to vote on the legislation—did not satisfy the standing requirement. As the claims were " 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches,' " the court found the legislator lacked standing. *Id.* at 267 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

Even more relevantly, federal courts have denied standing to members of Congress who sought to enjoin executive action, and, specifically, implementation of an executive order which allegedly exceeded the President's statutory and constitutional authority. *See, e.g., Raines,* 521 U.S. at 821–830, 117

S.Ct. 2312 (noting that it had never held that members of Congress had standing to assert an institutional injury against the executive, the United States Supreme Court concluded that individual congressmen lacked legislative standing to challenge the President's authority under the Line Item Veto Act, as members of Congress possessed an adequate political remedy, and could, *inter alia*, vote to repeal the statute); *Campbell v. Clinton*, 203 F.3d 19 (D.C.Cir.2000) (relying upon *Raines* and determining members of Congress did not have standing to challenge the President's alleged violation of the War Powers Resolution and the War Powers Clause of United States Constitution as Congress had legislative authority to stop the executive's use of military force in Yugoslav campaign); *Chenoweth v. Clinton*, 181 F.3d 112 (D.C.Cir.1999) (concluding members of House of Representatives did not possess standing to challenge to the President's creation of conservation program through executive order because dispute was susceptible to political resolution in that Congress could vote to terminate program); *see generally United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1382 (D.C.Cir. 1984) (finding standing did not exist for member of House of Representatives where the legislator's grievance consisted of "generalized, amorphous injuries due to ... the conduct of the Executive," or "a generalized complaint that [member's] effectiveness is diminished by allegedly illegal activities taking place outside the legislative forum" (citations omitted)).

What emanates from our Commonwealth's caselaw, and the analogous federal caselaw, is that legislative standing is appropriate only in limited circumstances. Standing exists only when a legislator's direct and substantial interest in his or her ability to participate in the voting process is negatively impacted, *see Wilt*, or when he or she has suffered a concrete impairment or deprivation of an official power or authority to act as a legislator, *see Fumo* (finding standing due to alleged usurpation of legislators' authority to vote on licensing). These are injuries personal to the legislator, as a legislator. By contrast, a legislator lacks standing where he or she has an indirect and less substantial interest in conduct outside the

legislative forum which is unrelated to the voting or approval process, and akin to a general grievance about the correctness of governmental conduct, resulting in the standing requirement being unsatisfied. *Id.* (rejecting standing where legislators' interest was merely disagreement with way administrator interpreted or executed her duties, and did not interfere with legislators' authority as members of the General Assembly).

■ Upon consideration, we find that Appellants are not aggrieved, as that term is understood in the standing context, because their interests in the underlying challenge to Executive Order 2015–05 are too indirect and insubstantial. Executive Order 2015–05 does not inhibit or in any way impact Appellants' ability to propose, vote on, or enact legislation. The order does not touch upon the constitutional or legislative prerequisites for the voting upon and enacting of legislation. Nor does the order prevent Appellants from acting as legislators with respect to advising, consenting, issuing, or approving matters within their scope of authority as legislators. Rather, the legislators' claim of aggrievement is only that the recently enacted Executive Order 2015–05 is a violation of the separation-of-powers doctrine, in that, they claim, it diminishes the effectiveness of, or is inconsistent with, prior-enacted legislation. Yet, these claims of injury reflect no impact on Appellants' right to act as legislators, and are more, in our view, in the nature of a generalized grievance about the correctness of governmental conduct. Simply stated, the assertion that another branch of government—here, the executive branch through the Governor's Executive Order—is diluting the substance of a previously-enacted statutory provision is not an injury which legislators, as legislators, have standing to pursue.

Indeed, taking the unprecedented step of allowing legislators standing to intervene in, or be a party to, any matter in which it is alleged that government action is inconsistent with existing legislation would entitle legislators to challenge virtually every interpretive executive order or action (or inaction). Similarly, it would seemingly permit legislators to join in any

litigation in which a court might interpret statutory language in a manner purportedly inconsistent with legislative intent. Critically, Appellants offer no limiting principle which would permit their intervention in the instant matter, but constrain their ability to initiate litigation, seek declaratory relief, or to intervene in any matter which does not, under the principles we express today, impact them in their role of legislators.

Moreover, Appellants recognize there is comprehensive legislation on the topic which was enacted long ago, and, they do not suggest that they are in any way prevented from enacting future legislation in this area. Indeed, like our federal counterparts, we are leery to recognize such uncabined and broad-based standing for legislators, as separation-of-powers problems are inherent in legislative standing, and claims of institutional injury, such as those before us, are often "fully susceptible to political resolution." *Chenoweth*, 181 F.3d at 116. Further, challengers exist who are, from a standing perspective, sufficiently impacted by the Governor's issuance of Executive Order 2015–05, as amply demonstrated by the parties in this matter who include patients, direct care health workers, and institutional health care providers. Finally, Appellants were permitted to participate as *amicus*, and, thus, their voices will be heard on the merits of the controversy.

Accordingly, we hold that Appellants' interests purportedly impinged by Executive Order 2015–05 are not directly or substantially related to unique legislative prerogatives, but, rather, are generalized interests in the conduct of government common to the general citizenry; thus, they do not satisfy the requirements of standing in these circumstances. Accordingly, we affirm the Commonwealth Court's denial of Appellants' Application to Intervene.

Justices BAER, DONOHUE, DOUGHERTY and WECHT join the opinion.

Justice DONOHUE files a concurring opinion.

Justice DOUGHERTY files a concurring opinion.

Chief Justice SAYLOR files a dissenting opinion.

Justice DONOHUE, concurring.

I join in the Majority's decision to affirm the Commonwealth Court's decision with respect to the present application for intervention. I write separately only to note my disagreement with the Majority's inclusion in its analysis of this Court's prior decision in *Fumo v. City of Philadelphia*, 601 Pa. 322, 972 A.2d 487 (2009). In particular, I disagree with the Majority's assertion that *Fumo* represents "the clearest articulation of the distinction between a matter implicating a legislator's direct and substantial interest in the voting process or power to act and one that does not." *op.* at 302, 136 A.3d at 142–43. *Fumo* has precedential value [1] only in the rare instance in which there has been an alleged executive usurpation of a right or power the General Assembly has, by legislative act, granted solely to itself. *Fumo*, 972 A.2d at 502. No such unusual circumstance exists in this case.

In my view, the Commonwealth Court's description in *Wilt v. Beal*, 26 Pa.Cmwlth. 298, 363 A.2d 876 (1976), of the limits of legislative standing to intervene in response to executive action constitutes the "clearest articulation" of the issue. "[L]egislators, as legislators, are granted standing to chal-

1. *Fumo* represents an atypical instance in which this Court acted in contravention of our general proscription against issuing academic or advisory opinions. *See, e.g., Philadelphia Entm't & Dev. Partners, L.P. v. City of Philadelphia*, 594 Pa. 468, 937 A.2d 385, 392 (2007). In *Fumo*, state legislators sought to intervene to vindicate their alleged exclusive power under the 1978 Dam Safety Act, 32 P.S. § 693.1–693.27, to grant a license for the use of submerged lands under the Delaware River to construct a casino. *Fumo*, 972 A.2d at 496. In a companion case decided almost a year prior to *Fumo*, however, this Court had already determined that the Dam Safety Act did **not** grant the General Assembly any such exclusive authority, and that instead, the City of Philadelphia had properly issued a license for the construction of the casino pursuant to legislative authority contained in prior (1907) legislation (53 P.S. § 14199, also known as "Act 321"). *HSP Gaming, L.P. v. City of Philadelphia*, 598 Pa. 118, 954 A.2d 1156, 1182 (2008). Accordingly, at the time we decided *Fumo*, this Court had already ruled that the state legislators had no exclusive licensing rights, which were the sole basis for their claimed right to intervene.

lenge executive actions when specific powers unique to their functions under the Constitution are diminished or interfered with. Once, however, votes which they are entitled to make have been cast and duly counted, their interest as legislators ceases." *Id.* at 881. In the present case, the General Assembly passed the Pennsylvania Labor Relations Act, 43 P.S. §§ 211.1–211.13, and the Public Employe Relations Act, 43 P.S. §§ 1101.101–1101.2301. At the time of passage, the interests of the members of General Assembly (including those of the proposed intervenors here), as legislators, ceased. For this reason, the Commonwealth Court did not err in denying Appellants' Application to Intervene.

Justice DOUGHERTY, concurring.

I join the Majority Opinion in full, writing separately in supplementation out of respect for the Senate Majority Caucus, and to address additional points on the prudential doctrine of standing to sue.

I candidly acknowledge the underlying political pressures attending this matter. A Democratic Governor takes an action and a finite but important group of Republican legislators, representing the Senate Majority Caucus, currently seeks redress in the courts premised upon status as legislators. Of course, a future challenge could arise where the political affiliations are reversed. Legislative challenges to executive actions obviously exist along a continuum. A bipartisan challenge brought by the General Assembly as a whole premised upon a claim of an improper inroad into legislative prerogative, for example, presumably would present a stronger case for recognizing legislative standing than a claim forwarded by a single legislator (regardless of party affiliation).[1] This case rests somewhere in between those extremes.

Notably, the parties are in agreement on the governing law—the relevant principles and instructive application are set

1. Like the Majority Opinion, I recognize legislative standing does not involve a distinct or separate analytical approach to standing, albeit the reality is cases considering the standing of legislators in prior disputes obviously offer the most direct guidance.

forth in *Fumo v. City of Philadelphia*, 601 Pa. 322, 972 A.2d 487, 497–502 (2009)—with disagreement focusing on application of those principles. The Senate Majority Caucus thus does not seek to revisit or adjust our established precedent; the Caucus seeks relief under *Fumo*. *See* Brief for Appellants (No. 59 MAP 2015) at 18 ("Here, the Majority Caucus has standing for the exact same reasons and the exact same rationale present in *Fumo*."). The Majority Opinion persuasively explains why *Fumo* and related precedent counsel a conclusion the Senate Majority Caucus lacks standing in this instance; in my view, the Majority Opinion strikes a proper balance.[2]

Given the prudential basis for standing doctrine, *see, e.g., Fumo*, 972 A.2d at 496, and being cognizant of the deference due members of a coordinate branch, if there were a developed and persuasive challenge to the existing approach to standing involving legislators, the Court no doubt would be open to its consideration. Indeed, it appears the Court has adopted a practical and flexible approach to the concept of standing generally. *See generally Johnson v. American Standard*, 607 Pa. 492, 8 A.3d 318, 331–34 (2010). This is so much the case that a Pennsylvania treatise has opined:

In light of the "requirement of standing under Pennsylvania law [being] prudential in nature," Pennsylvania decision-

---

**2.** I am in respectful disagreement with Justice Donohue concerning *Fumo* 's precedential value. *See* Concurring Opinion at 308 & n. 1, 136 A.3d at 146 & n. 1 (Donohue, J.). The parties do not suggest any limitation on the precedent. Moreover, justiciability questions (including political question limitations, standing, ripeness, and mootness) are threshold matters generally to be resolved before proceeding to the merits. *Robinson Twp. v. Commonwealth*, 623 Pa. 564, 83 A.3d 901, 916–17 (2013); *Council 13, AFSCME, AFL–CIO ex rel. Fillman v. Rendell*, 604 Pa. 352, 986 A.2d 63, 74 n. 10 (2009). The *Fumo* Court's decision to address standing first—which was explained by the Court, *see* 972 A.2d at 491 n. 1—appears to have followed this practice. Moreover, there is no indication in *Fumo* that a question of mootness was raised in light of the decision in *HSP Gaming L.P. v. City of Phila.*, 598 Pa. 118, 954 A.2d 1156 (2008), the Court was not required to raise the concern *sua sponte*, see *Rendell v. Pa. State Ethics Comm'n*, 603 Pa. 292, 983 A.2d 708, 718–19 (2009), and there are countervailing reasons that support reaching even moot questions. *See id.* (discussing considerations). Finally, *Fumo* was unanimous with respect to the principles governing legislative standing and their proper application. Under the circumstances, the decision remains fully viable precedent.

al law is somewhat unclear in distinguishing a plaintiff who has been adversely affected and a plaintiff who is merely asserting interests common to all citizens in procuring obedience to the law. The result is a very flexible, if not amorphous, concept of standing to sue.

G. Ronald Darlington et al., 20 West Pennsylvania Appellate Practice Series, § 501:15, at 803 (2015–16 ed.) (footnotes omitted). The authors illustrate this flexibility by noting various theories employed to recognize standing. Notably, the *Fumo* decision itself reflects a nuanced approach specific to legislative standing.

Finally, as the Majority Opinion notes, it is significant this intervention dispute does not pose a situation where the lawfulness of the Governor's Executive Order will proceed unchallenged, and the Senate Majority Caucus was permitted to participate as *amicus curiae*. *See* Majority Opinion, at 307, 136 A.3d at 145–46.

Under the circumstances, there is some force to this observation by appellees:

> The Senators' argument is particularly precarious, as there are 253 members of the General Assembly, each with his or her own political agendas and constituencies to protect. In this very case, Executive Order 2015–05 was defended by the Democratic caucuses in an amici curiae brief. That is the proper vehicle to show support for a position, not to become a party.

Brief for Appellees (No. 59 MAP 2015) at 25 (footnote omitted).

Chief Justice SAYLOR, dissenting.

I respectfully dissent, as I would recognize standing on the part of legislative leaders, acting on behalf of the Senate Majority Caucus, to intervene in the present proceedings to challenge Executive Order 2015–05 as *ultra vires*.

In the Pennsylvania Labor Relations Act,[1] the General Assembly granted to certain private-sector employees the

---

1. Act of June 1, 1937, P.L. 1168, No. 294, §§ 1–14 (as amended 43 P.S. §§ 211.1–211.13).

right to organize and bargain collectively. *See* 43 P.S. § 211.5. The Legislature, however, expressly undertook to exclude "any individual employed . . . in the domestic service of any person in the home of such person." *Id.* § 211.3(d). Moreover, under the Attendant Care Services Act,[2] the care recipient is invested with the "right to make decisions about, direct the provision of and control their attendant care services," including "hiring, training, managing, paying and firing of an attendant." 62 P.S. § 3052(3).

Executive Order 2015–05 extends to the Attendant Care Services Act. *See* 4 Pa.Code § 7a.111 (defining "Home care service programs"). It provides that an "employee organization" shall be elected to be the exclusive "representative" of direct care workers to "meet and confer" with the Department of Human Services regarding wages, hours, and other conditions of employment. 4 Pa.Code § 7a.113(a), (b)(2), (c); *id.* § 7a.114(b). This process may result in a "memorandum of mutual understanding," which, "[w]hen appropriate, and with the approval of the Governor, . . . will be implemented as the policy of the Department[.]" *Id.* § 7a.113(d)(1).

From my point of view, the Majority Caucus has advanced a colorable claim that Executive Order 2015–05 does not reflect an implementation of existing law by the executive branch, but rather, evinces an exercise of lawmaking power reserved to the legislative branch. In such a scenario, I do not agree that the concerns of a majority of the membership of one house of the General Assembly can be aptly characterized as "generalized interests in the conduct of government common to the general citizenry." Majority Opinion, at 307, 136 A.3d at 146.

Rather, I subscribe to a more functional approach to legislative standing which would take into account the aggregation of legislative interest in the matter and the character of the claimed intrusion in terms of its impact on the status quo relative to salient public policy. *Cf.* Jonathan Remy Nash, *A Functional Theory of Congressional Standing*, 114 MICH. L.REV. 339, 375–86 (2015). Along these lines, I am of the view

2. Act of Dec. 10, 1986, P.L. 1477, No. 150, §§ 1–8 (as amended 62 P.S. §§ 3051–3058).

that the Court should be sensitive to the concern being advanced, by a majority of the Senate, that alteration, by the Executive, of entitlements and interests impacts power and position both within the General Assembly and between the legislative and executive branches. *Accord id.*

For example, but for Executive Order 2015–05, there would be no need for the General Assembly to disapprove a "Direct Care Worker Representative." In the face of this Executive Order and in the absence of judicial review, however, any faction of the Legislature wishing to negate the order will be required to expend the political capital necessary to effectuate the disapproval. Under a functional approach to legislative standing, and taking into account that review is being sought by a majority caucus, I conclude that sufficient injury has been alleged to confer standing.

While I share the majority's concern with opening the door to a proliferation of challenges by legislators, I believe that taking into account the scale of the legislative interest, the colorability of the claim, and the presence or absence of political questions offers sufficient prudential limitations. While more specific parameters might be ideal, in my view, standing often devolves to an exercise in discernment. The alternative, in my view, is to deny a majority body of representatives of a coordinate branch of government the opportunity to participate directly in a serious constitutional challenge with a substantial functional impact on the General Assembly's own constitutionally delegated powers.