IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Marlon Osbourne, M.D. and the City of Philadelphia Office of the Medical Examiner, | : : : | |
| Appellants | : : | |
| v. | : | No. 1461 C.D. 2021 |
| | : | |
| Joshua M. Greenberg and Sandra Greenberg, Administrators of the Estate of Ms. Ellen R. Greenberg | : : : | Argued: November 15, 2022 |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                      HONORABLE ELLEN CEISLER, Judge
                      HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                                          FILED:  September 13, 2023

Marlon Osbourne, M.D., and the City of Philadelphia Office of the Medical Examiner (MEO) (together, MEO) appeal from the October 21, 2021 Order of the Court of Common Pleas of Philadelphia County (Trial Court) denying their Motion for Summary Judgment (Motion) in this mandamus and declaratory action.  The MEO argues that Dr. Joshua M. and Mrs. Sandra Greenberg (Parents), parents of the late Ellen R. Greenberg (Victim) and administrators of her Estate, lack standing to bring this action.  Alternatively, the MEO argues that neither a writ of mandamus nor declaratory relief is available to compel a medical examiner to change his professional opinion stated in a death certificate.  While this Court is acutely aware of the deeply flawed investigation of the Victim's death by the City of Philadelphia Police Department (PPD) detectives, the City of Philadelphia District Attorney's Office (DAO), and the MEO, we have no choice under the law but to reverse and remand to the Trial Court for the entry of judgment in favor of the MEO.  Even so,

in the interests of justice, we believe that providing a detailed review of the Victim's death and the ensuing investigation is clearly warranted with hopes that equity may one day prevail for the Victim and her loved ones.

## I. Background

### A. The Initial Investigation

At approximately 6:30 p.m. on January 26, 2011, the 27-year-old Victim was found deceased inside the apartment she shared with her fiancé, Sam Goldberg, in the Manayunk neighborhood of Philadelphia. *See* Reproduced Record (R.R.), Item No. 4(i), Investigation Report, 01/26/2011. The Victim's body was fully clothed, slumped against the cabinets in a seated position on the kitchen floor. *Id.* A knife was protruding from her chest. *Id.* The Victim sustained a total of 20 stab wounds, including a severe laceration to the top of her skull and stab wounds to the rear of her neck and spine. *See* R.R., Item No. 4(d), Osbourne Final Report. The Victim also had "[m]ultiple contusions on [the] upper and lower extremities in various stages of resolution." *Id.*

The next morning, January 27, 2011, Dr. Osbourne, then an assistant medical examiner, performed an autopsy on the Victim's body. R.R., Item No. 4(w), Deposition (Dep.) of Marlon Osbourne, M.D. (Osbourne Dep.), at 14.[1] Dr. Osbourne was briefed on the details of the scene by Stephen Olszewski, an investigator with the MEO's office who investigated the scene approximately two hours after the Victim's body was found. *Id.* at 15; *see also* R.R., Item No. 7(a), Olszewski Investigation Report, 4/15/2011 (Olszewski Report), at 1. Upon his arrival in the

---

[1] Dr. Osbourne left the MEO in 2014 to accept new employment at the Broward County (Florida) Medical Examiner's Office. R.R., Item No. 4(w), Osbourne Dep. at 12. At the time of his testimony, Dr. Osbourne was an employee of the Palm Beach County Medical Examiner's Office. *Id.* at 12-13.

Victim's apartment, Mr. Olszewski found her lifeless body slouched over in a seated position on the kitchen floor.   Olszewski Report at 2.  A kitchen knife was lodged in her chest.  Numerous other stab wounds had been inflicted in her chest, through the zippered shirt and t-shirt that she was wearing.  *Id*.  Strewn across the countertop and in the sink were several other kitchen knives, an overturned knife block, and a half-made fruit salad.  *Id.*; *see also* R.R., Item No. 4(n).  Inside a bedroom drawer, Mr. Olszewski recovered the Victim's prescription drugs, which included two types of anti-anxiety medication and a sleep aid.  Olszewski Report at 2.  The medication had been prescribed by Dr. Ellen Berman, a psychiatrist, who saw the patient on three occasions in the two weeks preceding her death.  *Id*.  Mr. Olszewski spoke by telephone with Mrs. Greenberg, who recalled having "a pleasant conversation" with the Victim earlier that morning while both women were on their way to work.  *Id.* at 3.

To account for the last hours of the Victim's life and the circumstances in which her body was discovered, Mr. Olszewski relayed to Dr. Osbourne information that Mr. Goldberg had given to PPD officers.  R.R., Item No. 4(w), Osbourne Dep. at 14.  Mr. Goldberg told the officers who responded to the 9-1-1 call that he had left the couple's sixth-floor apartment to visit their building's gym at approximately 4:45 p.m.  Olszewski Report at 1.  Approximately 45 minutes later, Mr. Goldberg said, he returned to the sixth floor but found the apartment door's swing bar lock engaged from the inside.  *Id.*  Mr. Goldberg explained that he returned to the building lobby to try to reach the Victim via cell phone calls and text messages.  *Id.*  When approximately one hour had passed without a response, Mr. Goldberg said, he decided to enter the apartment by force.  *Id.*  Mr. Goldberg stated that he returned to the sixth floor accompanied by a building security guard, later identified as Philip

Hanton, and forced open the door. *Id.* Once inside, Mr. Goldberg discovered the Victim seated on the kitchen floor, with her head slouched over. *Id.* Mr. Goldberg recounted that he immediately called 9-1-1. *Id.* In accordance with the emergency operator's instructions, Mr. Goldberg lifted the Victim's slouched head in order to perform cardiopulmonary resuscitation (CPR). *Id.* At that moment, Mr. Goldberg discovered the knife lodged in the Victim's chest. *Id.* Medics arrived and pronounced the Victim dead at 6:40 p.m. *Id.*

After taking an initial statement from Mr. Goldberg, PPD officers accompanied him to a police station for further questioning and released him that evening. *Id.* No summary or other detailed record of that interrogation is included in the record provided to this Court, nor was one made available to experts who later investigated the case (whose findings are summarized below). *See* R.R., Item No. 4(m), Wecht Report. Furthermore, there is no indication in the record that Mr. Hanton, or any other building staff member, was ever questioned by law enforcement officials. Astonishingly, in a subsequent written declaration, Mr. Hanton stated that that he did *not* accompany Mr. Goldberg to the sixth floor on the night in question and was *not* present when Mr. Goldberg entered the apartment. *See* R.R., Item No. 7(j), Hanton Declaration.

Dr. Osbourne and his supervisor at the MEO, Dr. Sam Gulino, later recalled several omissions from Mr. Olszewski's initial investigation. Notably, Mr. Olszewski failed to report 10 additional stab wounds in the back of the Victim's neck and head, which brought the total number of stab wounds to 20. *See* R.R., Item No. 4(d), Osbourne Final Report. One of those wounds was deep enough to rupture the dura mater, a thick membrane that envelops the spine. Osbourne Dep. at 48. The top of the Victim's scalp also bore a deep incision wound, approximately 6 and one-

4

half centimeters long. *Id.* Neither the incision wound nor the additional stab wounds appear to have attracted Mr. Olszewski's attention, an omission that Dr. Osbourne characterized as "unusual." Osbourne Dep. at 20. Dr. Osbourne also observed on the Victim's body "[m]ultiple contusions on [the] upper and lower extremities in various stages of resolution," of which Mr. Olszewski failed to note. *Id.* at 108-09. Dr. Gulino also acknowledged that Mr. Olszewski did not take the temperature of the Victim's body, a standard method of determining the time of death. R.R., Item No. 4(v), Dep. of Samuel Gulino, M.D. (Gulino Dep.) at 47. In addition, Mr. Olszewski did not specify which parts of the body he tested for rigor mortis, which also could have helped to determine exactly when the Victim died. Id. at 46-47. Dr. Gulino explained in his deposition testimony that rigor mortis tends to be first detected in the "small muscles, such as in the jaw or in the fingers." *Id.* at 46. Had rigor mortis been present in the Victim's legs, Dr. Gulino agreed that it would have suggested an earlier time of death than had been assumed. *Id.* at 47. However, Mr. Olszewski only noted that the body was "mostly flaccid," without specifying which body parts were examined. R.R., Item No. 7(a), Investigation Report. Evidence that would have provided critical and essential clues into the timing of the victim's death was thus completely overlooked.

Dr. Osbourne initially concluded that the manner of the Victim's death was *homicide*. *See* R.R., Item No. 7(c), Osbourne Original Report. As a result of his determination, PPD detectives obtained a search warrant identifying various items in the apartment "of evidentiary value in the investigation of a homicide by cutting instrument." R.R., Item No. 7(d). When the PPD detectives arrived to execute the warrant the day after the Victim was found, they discovered that the kitchen had been scoured and a number of the apartment's contents removed. *See* R.R., Item

5

No. 7(e), Declaration of Melissa Ware ¶¶ 15-16. The building's property manager, Melissa Ware, later explained that an unnamed PPD representative had advised her to call a third-party service to have the apartment thoroughly cleaned. *Id.* ¶¶ 7-8. There is no evidence in the record that Ms. Ware, the unidentified cleaning service, or the PPD representative were ever interviewed by investigating authorities.

In the weeks following the autopsy, Dr. Osbourne obtained new information that prompted him to reconsider his initial determination that the Victim had died by homicide. First, Dr. Osbourne recalled receiving an informal report from Dr. Lucy Rorke-Adams, a neuropathologist, following a brief examination of a piece of the Victim's spinal tissue. *Id.* at 60. By Dr. Osbourne's recollection, Dr. Rorke-Adams determined the Victim could have remained sufficiently mobile to inflict further wounds, even after the dura mater surrounding her spinal cord had been pierced. *Id.* at 61. Dr. Osbourne acknowledged that Dr. Rorke-Adams' observation of the tissue did not include a histologic or microscopic examination.[2] Osbourne Dep. at 60. Because Dr. Rorke-Adams also did not issue a written report on her observations, Dr. Osbourne's recollection is the only summary of her findings in the record.[3] *Id.*

In reevaluating his initial determination, Dr. Osbourne also considered new information about the Victim's mental health. Osbourne Dep. at 25. Specifically, the Victim had recently begun seeing Dr. Berman, who recalled seeing the Victim on three occasions in the two weeks preceding her death. *See* Olszewski Report at

---

[2] As discussed below, Dr. Lyndsey Emery, a pathologist with the MEO's office, conducted an analysis of the Victim's spinal tissue in 2019 that included a microscopic examination. *See* R.R., Item No. 4(p), Emery Dep. at 27.

[3] Dr. Rorke-Adams later told a journalist that she had no recollection of working on the case, and had no invoice or other written record indicating that she had. *See* Stephanie Farr, *A Death's Cruel Mystery*, THE PHILADELPHIA INQUIRER, Mar. 17, 2019, at A1.

3. Dr. Berman described the Victim as initially presenting with "severe anxiety," with which she had been struggling for the previous two months. *Id.* The Victim partially attributed her anxiety to "difficulty with work" and was considering quitting. *Id.* When the Victim was asked about Mr. Goldberg, Dr. Berman recalled, she "had nothing but good things to say about him," and described him as "wonderful." *Id.* To treat her symptoms, Dr. Berman prescribed the medications that were later recovered from the Victim's bedroom drawer. *Id.* Additionally, Dr. Berman recalled having no concerns that the Victim was suicidal. *Id.*

Approximately one month after the autopsy was performed, Dr. Osbourne attended a meeting with Dr. Gulino, a representative of the DAO, and two representatives of the PPD. *Id.* at 27; *see also* Gulino Dep. at 13. In that meeting, the DAO and PPD representatives discussed with Dr. Osbourne "their interactions with [Mr. Goldberg] and the statement [Mr. Goldberg] gave." *Id.* at 26. Dr. Osbourne was told that Mr. Goldberg had broken down the apartment door, and that a security guard had witnessed it. *Id.* Furthermore, Dr. Osbourne was told that an unnamed investigating officer found the door's swing bar lock in a damaged condition consistent with Mr. Goldberg's account of a forced reentry. *Id.* at 74-75. It was the first time that Dr. Osbourne had been called into a meeting to discuss the manner of death listed on a death certificate. *Id.* at 28.

Based on the information provided in the meeting, Dr. Osbourne reversed his prior medical opinion and determined that the Victim's wounds must have been self-inflicted. Consequently, Dr. Osbourne amended the death certificate to indicate that the manner of death was *suicide*. *Id.* at 81-82.

7

## B. Expert Reports

Dissatisfied with the investigation into their daughter's death, the Parents hired their own outside experts to conduct investigations into the manner of the Victim's death. We summarize their findings below.

### 1. Wecht (2012)

Renowned forensic pathologist Dr. Cyril H. Wecht examined the existing investigation records and issued a report on January 11, 2012. *See* R.R., Item No. 4(m) (Wecht Report). Dr. Wecht noted that suicides by stabbing are increasingly rare, as persons who die by suicide opt for "simpler choices" such as drugs, hanging, or firearms. *Id.* In the rare suicide by stabs to the torso, the person will usually remove the clothing first and after a few initial "tentative stabbings" to assess painfulness, death is typically effectuated through a single wound, most likely in the chest. *Id.* By contrast, the Victim in this case sustained multiple, deep, stab wounds *over* her clothing. *Id.* Dr. Wecht also observed that the instrument or instruments that caused the wounds entered her body from different angles and directions. *Id.* Dr. Wecht explained that this further militated against the conclusion that the victim's wounds were self-inflicted. *Id.*

Dr. Wecht found several other critical flaws and omissions in the materials with which he was provided. *Id.* Notably, Dr. Wecht found little support in the record to suggest that the Victim possessed the requisite state of mind to commit suicide. She left no note, was not deemed suicidal by her psychiatrist, and "seemed her usual self" when she communicated with her mother and a friend earlier on the day of her death. *Id.* For these reasons, Dr. Wecht concluded that the manner of the Victim's death was "strongly suspicious of homicide." *Id.* Dr. Wecht also noted the absence of records from the police station interrogation of Mr. Goldberg. *Id.* In Dr.

8

Wecht's view, the omission makes it difficult to draw any conclusions regarding the Victim's behavior and mental state in the hours before her death. *Id.* Dr. Wecht also noted that the investigators made no effort to examine the knife found in the Victim's chest for fingerprints. *Id.*

**2. Ross (2016, 2017, and 2021)**

Dr. Wayne K. Ross, a specialist in forensic pathology and neuropathology, examined the investigation materials and prepared a one-page letter on October 18, 2016. *See* R.R., Item No. 4(l). Therein, Dr. Ross briefly stated his opinion that, "***to a reasonable degree of medical certainty*[,] *the manner of [the Victim's] death is a* homicide**." *Id.* (emphasis added). In a second report issued January 10, 2017, Dr. Ross explained that his examination of the records revealed "evidence of a stab wound which penetrated the cranial cavity and severed the cranial nerves and brain." *Id.* Dr. Ross opined that this wound would have caused the Victim to suffer "severe pain, cranial nerve dysfunction and traumatic brain signs and symptoms." *Id.* Dr. Ross also observed marks and bruises on the Victim's neck consistent with strangulation. *Id.* Finally, Dr. Ross noted the "multiple bruises over the [Victim's] body" of varying ages, "consistent with a repeated beating." *Id.*

On June 1, 2021, Dr. Ross issued a third report after examining newer records. *See* R.R., Item No. 7(i). The report contains a 60-item list of what Dr. Ross characterizes as "reasons to change the manner of death" from suicide back to the original determination of homicide.[4] *Id.*

---

[4] In his 2021 report, Dr. Ross listed the following reasons for his recommendation: 1. the swing bar lock on the apartment door, which was "disturbed, not broken, from the inside"; 2. the alleged absence of Mr. Hanton, the security guard, while Mr. Goldberg reentered the apartment; 3. the "constellation of scene findings," which is "inconsistent with suicide" and "compatible with

**(Footnote continued on next page…)**

9

being staged"; 4. the bloodstain patterns in photographs, which are "inconsistent with suicide"; 5. "[m]inimal cast-off" of blood, which is "indicative of homicide"; 6. stab wounds in the front of the Victim's body inflicted "after head [and] neck stab wounds," which is "inconsistent with suicide"; 7. bloodstain patterns and "void patterns inconsistent with suicide"; 8. no "cast-off patterns, drip patterns, splash patterns from head wounds either standing or sitting inconsistent with suicide"; 9. a reconstruction of head wound patterns "would cause ample bloodstains," which are "not present"; 10. bloodstain patterns in the front of the body and void patterns which are "inconsistent with self-infliction"; 11. the towel and a pair of eyeglasses in the Victim's hand were indicative of "staging"; 12. the towel in the Victim's hand would have prevented her from stabbing the back of her head; 13. "staging" further indicated by "[m]inimal bloodstains" on the towel; 14. if the towel had been held in the Victim's left hand, then only her right hand could have been used for stabbing; 15. one-handed stabbing would be "inconsistent with self-infliction"; 16. if the towel had been held in the Victim's left hand during stabbing, then only the right hand would have been used for stabbing, but one-handed stabbing is "inconsistent with self-infliction"; 17. bloodstain evidence is inconsistent with the ability to stab the back of the head and chest due to injuries to the brain, cranial nerves, brain blood vessels, cerebrospinal fluid, and spinal cord nerves, in addition to the "horrific pain"; 18. absence of cut wounds to the hands, which is further "inconsistent with suicide"; 19. stab wounds that are generally "inconsistent with suicide since they will cause excruciating, if not incapacitating, pain"; 20. the lack of a suicide note; 21. stabbing that is "inconsistent with not causing pain"; 22. the availability of "means to escape out of the residence prior to [the] incident," which indicates that the Victim was "not trapped with nowhere to go"; 23. the lack of suicidal ideations; 24. the lack of previous suicide attempts; 25. the lack of mental disorders; 26. the fact that the Victim's sole mental condition was an anxiety disorder; 27. the therapy that the Victim was receiving as treatment for the anxiety; 28. the failure to administer a sex assault kit to find evidence of "binding and sexual abuse"; 29. the lack of controlled substance abuse; 30. the absence of controlled substances in the Victim's body at the time of the autopsy; 31. the absence of hesitation wounds on the Victim's arms; 32. hesitation wounds on the head and chest attributable to "staging"; 33. the fact that the Victim was "[i]ncapacitated by strangulation"; 34. "[d]efensive wounds" and "binding to wrists"; 35. the presence of "defensive wounds on [the] legs"; 36. the presence of older wounds on the Victim's extremities; 37. wounds to the "brain inconsistent with locomotion and motor activity"; 38. wounds to the "chest inconsistent with locomotion and motor activity"; 39. the "[c]rime scene indicates control"; 40. the presence of "knives in the sink," which are "inconsistent with suicide" and indicate "staging"; 41. the lack of "scene findings for suicide"; 42. the failure to examine rigor mortis in the Victim's feet; 43. the failure to document the wounds to the Victim's head and neck in the initial MEO investigation; 44. the findings regarding the Victim's head and neck during the autopsy, which indicate homicide; 45. the failure to examine "subtle blood stains in [the] sink, counter, [and] other areas," which indicate "clean up and staging"; 46. the failure to process the scene for homicide; 47. the failure to photograph the "[m]ale actor" for "injuries"; 48. the failure to examine the "[m]ale actor" for blood

**(Footnote continued on next page…)**

### 3. Lee (2018)

Dr. Henry C. Lee, founder of the Henry C. Lee Institute of Forensic Science at the University of New Haven, issued a report on January 29, 2018. *See* R.R., Item No. 4(n). After examining photographs of the scene, Dr. Lee determined that some of the wounds on the back of the Victim's head would have been difficult to inflict herself, given their location. *Id.* In Dr. Lee's view, the bloodstain patterns suggested that the Victim was in a standing position when she sustained some of her stab wounds, but was in the seated position in which she was found when sustaining other wounds. *Id.* Additionally, Dr. Lee noted the "[m]ultiple contusions" on the Victim's body, "in various stages of healing," as well as the sheer number of wounds that the Victim sustained on the day of her death. *Id.* In light of these details, Dr. Lee concluded that "[t]he number and type of wounds and bloodstain patterns observed are consistent with a homicide scene." *Id.*

---

stains; 49. the failure to examine the "[m]ale actor's clothing for bloodstains; 50. the absence of brain tumors that may have caused suicide; 51. the absence of any "incapacitating diseases to cause suicide"; 52. the "[m]inimal evidence" of suicide in contrast with the "overwhelming evidence of homicide," which, pursuant to principles of forensic methodology, means that the case should be "pursued as homicide"; 53. Dr. Osbourne's initial conclusion that the manner of death was homicide, which was only changed in light of information now known to be false; 54. the findings of Dr. Emery (discussed below), which indicate homicide; 55. what Dr. Ross characterizes as Dr. Emery's conclusion that the Victim sustained the cut to the dura mater of her spinal cord "after she was already dead"; 56. the "[h]istologic review of slides" of the Victim's spinal tissue, which suggests that the manner of death was "not suicide"; 57. the definition of "suicide," "homicide," and "could not be determined" used by Pennsylvania pathologists; 58. the published standards of the National Association of Medical Examiners (NAME), which, according to Dr. Ross, instruct that a mere "more likely than not" burden of proof is insufficient for a death to be classified as a suicide; 59. NAME's standards' requirement that the finding of suicide must be supported by "70% or greater degree of medical certainty"; and 60. the necessary degree of medical certainty to support the conclusion that the Victim died by suicide, which in this case is "patently lacking." R.R., Item No. 7(i).

11

## 4. Eelman (2017)

Detective Scott Eelman, a specialist in crime scene reconstruction, conducted an analysis of investigation materials and issued a report on April 14, 2017. *See* R.R., Item No. 4(o). Although Detective Eelman declined to make a general determination regarding the manner of the Victim's death, he called attention to several conspicuous details in the investigation materials. The bulk of his report is devoted to the bloodstain evidence in the scene photographs, which, in Detective Eelman's view, "is inconsistent with [the] position in which [the Victim] was found." *Id.* Dr. Eelman explained that the bloodstains on the Victim's head branch out in several directions, indicating that "her head was in different positions as this blood flowed." *Id.* For example, one "significant" flow pattern moves across her cheek and "rearward into the hairlines below and behind the left ear." *Id.* Such a movement of blood would be contrary to gravity, given that the Victim appeared to have died with her head slumped forward. *Id.*

In addition to the bloodstain evidence, Detective Eelman examined photographs of the apartment door. While acknowledging some damage to the door component of the swing bar lock, Detective Eelman noted that the door jamb component of the lock did "not appear to show any damage." *Id.* Detective Eelman also noted the absence of debris on the floor from the damaged swing bar lock. *Id.*

Like Drs. Wecht, Ross, and Lee, Detective Eelman drew attention to several glaring omissions from the investigative materials provided to him. For example, no photographs appear to have been taken of the refrigerator, kitchen pantry, kitchen ceiling, "or any portion of wall between the kitchen and the front door." *Id.* Additionally, Detective Eelman noted the absence of any photographs of Mr. Goldberg or of his footwear or clothing. *Id.*

12

### 5. BioMx (2021)

BioMx, a Virginia-based consulting firm specializing in computational biomechanics and accident reconstruction, analyzed case materials and issued a report on May 12, 2021. *See* R.R., Item No. 7(f). Its analysts determined that the wounds to the Victim's head and neck were "consistent with focalized stabbing by an assailant," rather than self-infliction. *Id.* They further determined that the wounds inflicted on her chest and abdomen would result in impaired motor function, precluding "repeatable sustained motions of the upper extremities, such as in purposefully stabbing [oneself]." *Id.* Finally, the analysts observed the contusions across the Victim's body and determined that they were "consistent with assailant[-]oriented trauma and not with self-inflicted injuries." *Id.* The analysts concluded that "[the Victim's] manner of death is not biomechanically consistent with suicide." *Id.*

### C. The 2019 Reexamination and Subsequent Developments

As a result of the additional expert reports, the Parents made two attempts to persuade government officials to reopen the investigation. The first was in 2018, when the Pennsylvania Office of Attorney General (OAG) agreed to reexamine the case.[5] R.R., Item No. 4(i), OAG E-mail to Stephanie Farr. Consequently, the OAG

---

[5] The Parents initially contacted Philadelphia District Attorney Larry Krasner in an effort to reopen the criminal investigation. R.R., Item No. 4(g), Parents' Reply to New Matter ¶¶ 84. Since Mr. Krasner had been previously retained by the Parents to assist with the investigation, he referred to the case to the OAG to avoid the appearance of a conflict of interest. *Id.* ¶ 85.

13

conducted its own investigation, and concluded that suicide was properly determined to be the manner of the Victim's death.[6] *Id.*

The second attempt was initiated on June 19, 2019, when the Parents' attorney wrote a letter to Dr. Gulino detailing the experts' findings. *See* R.R., Item No. 7(h). The letter noted that the experts were unanimous in their opinion that the Victim did not die by suicide, and urged Dr. Gulino to undertake "a closer examination and more thorough investigation" of her death. *Id.* at 6. In response to the letter, Dr. Gulino instructed Dr. Emery, an MEO examiner who was trained as a neuropathologist, to examine a specimen from the Victim's spinal cord. R.R., Item No. 4(v), Gulino Dep. at 74.

_____

[6] In a March 8, 2019 e-mail message to a journalist, an OAG representative explained its conclusion as follows:

> Following the initial 2011 investigation carried out by the [PPD], our office received this case in 2018 on a conflict referral from the [DA's] Office. We conducted our own thorough investigation to determine a manner of death—interviewing the chief medical examiner of Philadelphia and the medical examiner who performed the autopsy, meeting with the family's representatives, and reviewing information they provided to our attorneys, among other steps. Among the additional evidence we reviewed were web searches for "methods of committing suicide," "quick death" and "depression done on [the Victim's] personal computer in the weeks before her death, and text messages between [the Victim] and a family member on the day of her death showing the decedent in serious mental distress. Our Office has concluded that this evidence supports "suicide" as the manner of death; accordingly, we have communicated our findings to the family through its representatives and have closed this investigation.

R.R., Item No. 4(i) (punctuation modified).

In response, the Parents asserted that, "long before the OAG obtained access to any information purportedly extracted from [the Victim's] computer, the chain of custody had been broken because [the Victim's] computers were improperly removed from her apartment and in the possession of third parties days after her death." R.R., Item No. 4(g), Parents' Reply to New Matter ¶ 87.

14

During a 45-minute visual examination of the Victim's spinal tissue, Dr. Emery observed what she described as "disruptions in the tissue." Emery Dep. at 27. For a clearer picture of the disruptions' causes and their potential consequences, Dr. Emery excised several sections of the spinal tissue for a microscopic examination. *Id.* Viewing the sections through a microscope, Dr. Emery determined that the injury to the dura mater surrounding the Victim's spine did not result in hemorrhaging, as would normally occur. *Id.* at 32. Furthermore, Dr. Emery observed a disruption of the functional tissue of the spinal cord itself; again, however, Dr. Emery did not see an indication of a "vital reaction" by the body to that disruption. *Id.*

In Dr. Emery's view, the lack of such a vital reaction could be explained by four distinct possibilities. First, the blows could have been inflicted just a moment before death, meaning that the Victim's body did not have time to react before expiring. *Id.* at 33. Second, the blows may have been inflicted moments *after* the Victim had expired, which would have precluded hemorrhaging or other vital responses. *Id.* Third, the damage could have occurred during Dr. Osbourne's autopsy on the morning after the Victim's death. *Id.* Lastly, the injury may have been simply too minor to cause reactions such as hemorrhaging or cellular death. *Id.* at 34.

Based on her findings, Dr. Emery declined to draw a firm conclusion as to the manner of the Victim's death. *Id*. at 35. Dr. Emery explained that, if hemorrhaging had not occurred because the injuries were insufficiently severe (the fourth possibility described above), then there could have been "minimal pain," and the Victim's motor skills would not have been severely impaired. *Id.* at 36-37. Thus, Dr. Emery opined that it was not impossible that the wounds were self-inflicted. *Id.*

15

at 90. However, Dr. Emery acknowledged that the lack of vital reactions to the Victim's spinal injuries weighed in favor of a finding that she was already dead when the wounds were inflicted. *Id.* at 76.

Reviewing Dr. Emery's findings, Dr. Gulino concluded that he did "not have sufficient reason" to reverse Dr. Osbourne's determination that the Victim had died by suicide. Gulino Dep. at 75. Dr. Gulino explained that, in his experience, damage to the upper part of the spine such as that observed by Dr. Emery was a common by-product of autopsy procedures. *Id.* at 69. Furthermore, Dr. Gulino explained that homicides by cutting instruments tend to result in defensive wounds on the hands and forearms, which were not evident on the Victim's body. *Id.* at 33. By contrast, the "clusters" of wounds on her chest and neck were, in Dr. Gulino's view, more consistent with the hesitation wounds commonly inflicted during suicide. *Id.* at 70.

On October 15, 2019, the Parents, in their capacity as administrators of the Victim's Estate, filed a Complaint in the Trial Court, seeking mandamus and declaratory relief. R.R., Item No. 4(b). Count I sought a writ of mandamus compelling the MEO to revise the Victim's death certificate to indicate that the manner of death "[c]ould not be determined." *Id.* ¶ 74. Therein, the Parents alleged that "the information recently supplied to the [MEO] . . . in addition to that information already known to the [MEO] in 2011, establish as a matter of law" that suicide was not the appropriate manner of death to list on the death certificate. *Id.* ¶ 72. The Parents further alleged a variety of harms, including the evidentiary value that the death certificate would have in "a claim or dispute involving [the Victim's] Estate"; the stigma of suicide, which "deprives surviving family members of the closure and peace of mind to which they are otherwise entitled"; the impact of the death certificate on "State and national mortality statistics" as well as on "medical

16

and health research"; and the impediment posed by the death certificate on "the goals of securing justice and promoting criminal accountability." *Id.* ¶¶ 55-58. In Count II, the Parents alternatively sought declaratory relief, asking the Trial Court to issue an order declaring that the Victim's manner of death could not be determined. *Id.* ¶ 77.

During the course of pre-trial discovery, the parties submitted several exhibits as evidence. One was a written declaration from Mr. Hanton, the security guard who was on duty at the apartment building on the night of the Victim's death. R.R., Item No. 7(j), Hanton Declaration. Contrary to Mr. Goldberg's account, Mr. Hanton maintained that he did not escort Mr. Goldberg to the sixth floor, nor was he present when Mr. Goldberg forced open the apartment door. *Id.* ¶ 7. The Parents also presented still images from surveillance footage, which confirmed that Mr. Goldberg went up to the apartment alone. R.R., Item No. 7(k), Security Video Still (Jan. 25, 2011, 6:32 p.m.). Additionally, the Parents submitted a photograph of the inside of the apartment door, taken on the night of the Victim's death. R.R. Item No. 7(b). The photograph shows that the screws attaching the swing bar lock to the door were dislodged, but that the door appears to be otherwise undamaged, consistent with Dr. Ross's and Detective Eelman's analyses. *See* R.R., Item No. 7(b).

In response, the MEO submitted a written declaration from Dr. Emery, in which she reiterated that she could not form an opinion as to the manner of death based on her examination of the Victim's spinal tissue. R.R., Item No. 4(r), ¶ 9. Dr. Emery also stated that she was unable to definitively determine why there was no sign of hemorrhaging around the injuries to the Victim's spine. *Id.* ¶ 8.

17

Following the close of discovery, on June 21, 2021, the MEO filed its Motion.[7] R.R.., Item No. 2. Therein, the MEO argued that the Parents lacked standing as administrators of their daughter's Estate because their "grief and concern, however real, about the stigma of suicide, do not constitute actual harm in the sense that the law requires," and because the Parents failed to allege any other cognizable form of harm. R.R., Item No. 2, ¶¶ 58-66. The MEO further argued that even if the Parents had standing, mandamus and declaratory relief were expressly barred as legal bases to compel the revision of death certificates. *Id.* ¶¶ 42, 58, 67. At a hearing on the Motion on October 15, 2021,[8] the parties presented their deposition testimony, and the Parents stated their allegation that Dr. Osbourne amended the death certificate at the PPD's urging. *See Osbourne v. Greenberg* (C.C.P. Phila. Cnty., No. 191001241, filed June 8, 2022) (Trial Ct. Op., 6/8/2022), slip op. at 10 (unpaginated).

On October 21, 2021, The Trial Court issued its Order denying the Motion, without further explanation. *See* R.R., Item No. 1. In its subsequent Pa.R.A.P. 1925(a) opinion,[9] the Trial Court agreed with the MEO that any purported stigma of suicide was insufficient to support standing. *See* Trial Ct. Op., 6/8/2022, at 7 (citing *Nader v. Hughes*, 643 A.2d 747, 750 (Pa. Cmwlth. 1994)). The Trial Court further determined that any interest in reopening a criminal investigation is too speculative

---

[7] The MEO previously filed preliminary objections to the Complaint on November 12, 2019. Original Record (O.R.), Item No. 7. Therein, the MEO raised issues nearly identical to those raised in its subsequent summary judgment motion. The Trial Court overruled the preliminary objections on January 7, 2020. O.R., Item No. 10.

[8] The record presented to this Court does not include a transcript of the October 15, 2021 hearing.

[9] Pa.R.A.P. 1925(a) provides that, upon the receipt of a notice of appeal, "the judge who entered the order giving rise to the notice of appeal, if the reasons for the order do not already appear of record, shall . . . file of record at least a brief opinion of the reasons for the order."

18

to create a "real and concrete" controversy, as "there is no guarantee that the [PPD], the [DA], or the [OAG] will reopen the case or pursue [the Victim's] killer." *Id.* (citing *Pittsburgh Palisades Park, LLC v. Com.*, 888 A.2d 655, 659 (Pa. 2005)). Nevertheless, the Trial Court concluded that the death certificate as currently written "would devastate any wrongful death action, insurance claim, or any claim against MEO officials for emotional or financial injuries as a result of alleged misconduct." *Id.*

Regarding the Parents' assertions of the right to mandamus and declaratory relief, the Trial Court held that both were available. Trial Court Op., 6/2/2022, at 15. The Trial Court explained that, while mandamus may not be used to reverse an official's proper use of discretionary powers, it does permit a court to intercede "to correct the improper exercise of discretion." *Id*. at 10 (unpaginated). In the specific context of death investigations, the Trial Court noted, the responsible official "cannot act capriciously or arbitrarily[,] and his discretion is always subject to review." *Id.* (citing *Marvin v. Monroe County*, 35 A.2d 781, 782 (Pa. Super. 1944)). As for declaratory relief, the Trial Court held that the potential impact of the death certificate on a wrongful death action constituted the "ripening seeds of a controversy" relating to the "invasion or threatened invasion" of Parents' legal rights. *Id.* at 13 (citing *Ronald H. Clark, Inc. v. Township of Hamilton*, 562 A.2d 965, 967 (Pa. Cmwlth. 1989)).

Following the Trial Court's decision, the MEO petitioned this Court for leave to file an interlocutory appeal, which we granted on February 4, 2022. Our February 4, 2022 Order stated that we would consider whether the Parents, as administrators of the Victim's Estate, "have standing to seek court-ordered revision of the manner of their adult child's death where the harm they identify is the alleged stigma of

19

suicide, the forestalling of any further investigation into the death, and the effective bar to bringing a potential lawsuit including a wrongful death action." We also stated that we would consider whether "mandamus and/or declaratory relief [is] available to compel revision of a medical examiner's opinion as to the manner of death stated on a death certificate." The parties presented oral argument before this Court on November 15, 2022.[10]

## II. Issues

On appeal, the MEO argues that the Parents lack standing to file this action in their capacity as administrators of the Victim's Estate. In the alternative, the MEO asserts that neither mandamus nor declaratory judgment can be used to compel the MEO to amend the Victim's death certificate. Consequently, the MEO argues, the Trial Court erred in denying its Motion.[11]

## III. Discussion

As a threshold matter, standing must be resolved before a court can proceed to the merits of an action. *Interest of K.N.L.*, 284 A.3d 121, 137 (Pa. 2022). The issue of standing relates to a litigant's capacity to pursue a particular legal action and

---

[10] While the MEO's appeal in this matter was pending, the Parents initiated a separate tort action in the Trial Court, which is currently underway, against Drs. Gulino, Osbourne, and Emery. *See Greenberg v. Gulino* (C.C.P. Phila., No. 220601515).

[11] When a party seeks summary judgment, the trial court shall enter judgment if there is no genuine issue of material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. *Firetree, Ltd. v. Dep't of Gen. Servs.*, 978 A.2d 1067, 1071 n.5 (Pa. Cmwlth. 2009). In considering the merits of a motion for summary judgment, the trial court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Id.* This Court's standard of review on appeal from the grant or denial of summary judgment is *de novo*, and our scope of review is plenary. *Clean Air Council v. Sunoco Pipeline L.P.*, 185 A.3d 478, 485 (Pa. Cmwlth. 2018). Our review is limited to determining whether the trial court committed an error of law or abuse of discretion. *Id.*

20

requires that the litigant be adversely affected, or aggrieved, in some way. *Id.* at 136. In determining whether a party is aggrieved, courts consider whether the litigant has a substantial, direct, and immediate interest in the matter. *Markham v. Wolf*, 136 A.3d 134, 140 (Pa. 2016). For the interest to be *substantial*, the party's concern in the outcome of the challenge must surpass the common interest of all citizens in procuring obedience to the law. *Id.* The interest is *direct* if it can be demonstrated that the matter caused harm to the party's interest. *Id.* Finally, the concern is *immediate* if the causal connection between the action complained of and the injury to the party challenging it is not remote or speculative. *Id.*

Here, the MEO asserts that the Parents lack standing because they have failed to identify any legally recognized form of harm as a result of the MEO's refusal to amend the death certificate. The MEO argues that the types of harm alleged by the Parents fall into two categories: (1) the effects of "the alleged stigma of suicide," and (2) the hindrance of further litigation, whether civil or criminal, relating to the Victim's death. MEO's Br. at 13. According to the MEO, harm of the first category fails to confer standing because this Court has held, in *Nader v. Hughes*, 643 A.2d 747 (Pa. Cmwlth. 1994), that the "stigma of suicide" is insufficient to confer standing.[12] The MEO argues that harms of the second category fail to confer

_____

[12] In *Nader*, a father challenged a county coroner's conclusion that his adult son's lethal gunshot wound had been deliberately self-inflicted. 643 A.2d at 748-49. The father sought a writ of mandamus compelling the coroner to conduct an inquest into his son's death. *Id.* at 749. The father asserted standing on the basis of his "extreme personal grief, stress, and anguish," as well as the "blatant stigma" arising from the community's belief that a close family member had died by suicide. *Id.* at 753. Rejecting the father's arguments, this Court concluded that the family's emotional trauma "does not result from the statutory duty of the coroner to investigate such a death, but results from the death of the decedent," and that "any stigma the family and the decedent may suffer cannot be said to have resulted from the coroner's exercise of discretion whether or not to conduct an inquest." *Id.*

21

standing because they are too speculative and remote to create a direct or immediate interest, particularly when any further litigation would "almost certainly be time-barred." *Id.* at 13-14. Furthermore, the MEO argues, the death certificate, as currently written, is not legally binding on any subsequent civil or criminal proceeding. *Id.* at 20.

In response, the Parents argue that the MEO mischaracterizes their claims as focused on the stigma of suicide, which, the Parents maintain, is "neither the primary nor the sole factor motivating this litigation." Parents' Br. at 22. The Parents assert that they are indeed aggrieved because the death certificate prevents the Victim's Estate from pursuing various forms of legal relief, including: an action seeking "damages for [the Victim's] wrongful death," should a perpetrator ever be identified; court-ordered restitution following a criminal conviction of the perpetrator; a claim for damages against the MEO; and payment from the Pennsylvania Victims Compensation Fund. *Id*. at 20. Furthermore, the Parents argue that they have standing based on their desire to seek justice through the reopening of the criminal investigation into their daughter's death. *Id.* at 24.

The Trial Court agreed with the MEO that "the social stigma of suicide" was insufficient to confer standing pursuant to *Nader*. Trial Ct. Op., 6/8/2022, at 7 (unpaginated). The Trial Court further held that any interest that the Parents have in a reopened criminal investigation was too speculative to confer standing. *Id.* However, the Trial Court nevertheless concluded that the Parents have standing because the death certificate, as currently written, "would devastate any wrongful death action, insurance claim, or any claim against city officials for emotional or financial injuries as a result of alleged misconduct." *Id.* In support, the Trial Court cited this Court's observation in *Chadwick v. Dauphin County Office of the Coroner*,

22

905 A.2d 600, 606 n.9 (Pa. Cmwlth. 2006), that a "death certificate would have evidentiary value in a claim dispute." Trial Court Op., 6/8/2022, at 8 (unpaginated). In conclusion, the Trial Court observed that it "cannot think of any party *who could possibly have standing if not the Estate of the deceased*." *Id.* at 9 (emphasis in original).

In order to evaluate the Parents' claim that the death certificate prevents the Estate from pursuing various forms of legal relief, it is necessary to examine the legal soundness of each claim of potential relief. For the following reasons, our examination leads us to conclude that no form of relief identified by the Parents suffices to confer standing in this matter.

### A. Wrongful Death

Section 8301(a) of the Judicial Code provides that an "action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another." 42 Pa.C.S. § 8301(a). A wrongful death claim belongs exclusively to the decedent's beneficiaries and is meant to cover pecuniary and emotional loss suffered by those beneficiaries as a result of the death. *Rickard v. Am. Nat'l Prop. and Casualty Co.*, 173 A.3d 299, 306 (Pa. Super. 2017). Under 42 Pa.C.S. § 5524(2), such actions "must be commenced within two years," and 42 Pa.C.S. § 5502(a) further provides that the two-year limitations period begins to run "from the time the cause of action accrued." The so-called discovery rule, which tolls limitations on some claims until the time when a claimant learns of an injury or loss, does not apply to wrongful death claims. *Pastierik v. Duquesne Light Co.*, 526 A.2d 323, 327 (Pa. 1987); *see also Pennock v. Lenzi*, 882 A.2d 1057, 1060 (Pa. Cmwlth. 2005) (affirming dismissal of wrongful death action, where death occurred nearly

23

eight years before filing of complaint, because "the statute of limitations for wrongful death . . . claims begins to run, at the latest, at the time of death and cannot be extended further by the discovery rule").

Instantly, the Parents argue that "the [MEO's] refusal to designate [the Victim's] murder accurately in her death certificate has barred the Estate for all practical purposes from seeking damages for [the Victim's] wrongful death." Parents' Br. at 24. Were the Parents to bring a wrongful death action, they explain, the fact "that the manner of death remains suicide in [the Victim's] official certificate of death" would not only "effectively bar any such action," but "potentially subject [Parents] to countersuit for wrongful use of civil proceedings." Parents' Br. at 28. Agreeing, the Trial Court found it "disingenuous to suggest that the [Victim's] Estate in a wrongful death suit could possibly recover when the [d]efendant could produce the [Victim's] death certificate stating that she had died by suicide." Trial Ct. Op, 6/2/2022, at 13 (unpaginated). Thus, the Trial Court held that "a [d]eclaratory [j]udgment that the death certificate is erroneous, or [a judgment] that the [MEO] abused his discretion in amending the certificate may be appropriate." *Id.* at 14.

The law does not support the Trial Court's determination that any interest that the Parents may have in a potential wrongful death action is sufficient to confer standing. As noted, a wrongful death plaintiff has two years from the time of death to commence such an action, which means that the latest that the Parents could have filed suit was on or about January 26, 2013. Since it is settled Pennsylvania law that

24

the discovery rule is not applied to wrongful death cases,[13] there is no foreseeable set of circumstances in which such an action could proceed.

## B. Criminal Restitution

Section 1106 of the Crimes Code provides, in relevant part, that "[u]pon conviction for any crime . . . wherein the victim suffered personal injury directly resulting from the crime, the offender shall be sentenced to make restitution in addition to the punishment prescribed therefor." 18 Pa.C.S. 1106(a). Restitution's primary purpose is to rehabilitate the offender by impressing upon him that his criminal conduct caused the victim's personal injury, and that it is his responsibility to repair the injury as far as possible. *Com. v. Keenan*, 853 A.2d 381, 382-83 (Pa. Super. 2004). Because a decedent victim's estate stands in the victim's shoes, restitution may be properly awarded to that estate. *Com. v. Biauce*, 162 A.3d 1133, 1140 (Pa. Super. 2017).

Instantly, the Parents argue that the death certificate has deprived the Estate of its status as a crime victim, "thereby denying [it] the ability to seek or obtain criminal restitution." Parents' Br. at 20. This argument is unavailing. As the Trial Court aptly noted, *the Parents'* interest in reopening the investigation and in finding their daughter's purported killer are too speculative to constitute aggrievement by

---

[13] Even if Pennsylvania law applied the discovery rule to wrongful death cases, it would be unlikely to have any impact in this case. As noted above, the discovery rule "tolls the statute of limitations until a time when a tort victim can discover his injury and its cause through the exercise of reasonable diligence." *Pennock*, 882 A.2d at 1059. In *Pennock*, the parent plaintiffs alleged that their son died of bacterial and viral infections in 1995 due to prolonged exposure to sewage sludge being used on the defendants' farm. *Id.* The plaintiffs asserted that they "could not [have] reasonably know[n]" of the connection between their son's death and the defendants' conduct until 2001, when they read a newspaper article on the subject. *Id.* In this case, by contrast, Dr. Wecht issued his conclusion that the Victim's manner of death was "strongly suspicious of homicide" on January 11, 2012, less than one year after the death occurred. *See* R.R., Item No. 4(m).

*the Estate*. Their claim that the Estate has been deprived of court-ordered restitution is also speculative. To conclude that the interest in restitution gives the Parents standing as estate administrators requires the assumption that, if the requested relief were granted, law enforcement will reopen the investigation; that a suspect will be identified, charged, and brought to trial; that the defendant will be convicted; *and* that the criminal trial court will order the defendant to pay restitution to the Estate. Such hypothetical events fail to establish a real or concrete controversy. As the Trial Court noted, "there is no guarantee that the [PPD], the [DA], or the [OAG] will reopen the case or pursue [Victim's] killer" even if the death certificate were amended. Trial Ct. Op., 6/8/2022, at 7 (unpaginated). Furthermore, as discussed more fully below, law enforcement is free to reopen a criminal investigation regardless of what the death certificate states. Indeed, the OAG has already reexamined the case, notwithstanding the manner of death listed on the death certificate.

### C. Insurance Claims

When a death certificate is offered as evidence in a dispute involving insurance proceeds, the contents of the certificate may be admitted "insofar as they would be admissible if the official preparing the same had been called as a witness." *Pittsburgh Nat'l Bank v. Mut. Life Ins. Co. of New York*, 417 A.2d 1206, 1209 (Pa. Super. 1980). As noted, this Court has opined in *Chadwick* that an "official death certificate would have evidentiary value in a claim dispute," if life insurance coverage turned "on whether the policyholder's death was caused by accident or by self-destruction." 905 A.2d at 606 n.9.

In support of its denial of summary judgment, the Trial Court opined that the death certificate as currently written "would devastate any . . . insurance claim."

26

Trial Ct. Op., 6/8/2022, at 8 (unpaginated). However, there is no evidence in the record that any insurance proceeds are impacted by the manner of death listed on the Victim's death certificate. In fact, the Parents have not argued at any stage in this case that any insurance proceeds are at issue. The impact that the death certificate would have on an insurance claim is therefore entirely speculative, and is insufficient to confer standing.

### D. Victims Compensation Fund Claims

The Parents also argue that the Estate is aggrieved because it has been denied the ability to seek or obtain payment from the Victim's Compensation Fund. Section 701(a) of the Crime Victims Act (CVA)[14] provides, in relevant part, that the following persons shall be eligible for payment from the Victims Compensation Fund: a direct victim; an intervenor; a surviving spouse, a parent, or child of a deceased direct victim or intervenor; any other individual dependent for principal support upon a deceased direct victim or intervenor; any person who assumes the obligation or who pays for the crime scene cleanup, funeral, or burial expenses incurred as a direct result of the crime; hospitals and certain other health care providers; and certain persons eligible for counseling. 18 P.S. § 11.701(a)(1)-(8). A claim for payment "may not be filed by the estate of a direct victim or intervenor." 37 Pa. Code § 411.11(n); *see also Bradley v. Crime Victim's Comp. Bd.*, 621 A.2d 1228, 1230 (Pa. Cmwlth. 1993) (holding that, while the definition of victim under the CVA "includes persons who subsequently suffer death as a result of a crime, a 'victim' can no longer file a claim for compensation"). Therefore, we reject the Parents' argument.

---

[14] Act of November 24, 1998, P.L. 882, as amended, 18 P.S. § 11.701(a).

## E. Tort Claims Against City Officials

Civil actions against government officials are governed by Section 8550 of the Judicial Code, commonly known as the Political Subdivision Tort Claims Act (Tort Claims Act), 42 Pa. C.S. § 8550. In relevant part, Section 8550 of the Tort Claims Act provides that the general rule of official immunity shall not apply in "any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that *the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct*." 42 Pa. C.S. § 8550 (emphasis added). Our Court has explained that for purposes of Section 8550, "willful misconduct" is synonymous with an "intentional tort." *Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1023 (Pa. Cmwlth. 2014).

Instantly, the Parents argue that the death certificate "is considered *prima facie* evidence of the fact of death that can be introduced in court as evidence of compelling value to a jury" in an action brought for "financial and emotional injuries caused by the intentional misconduct of City officials." Parents' Br. at 27-28 (citing Section 810 of the Vital Statistics Law of 1953[15]). In support, the Parents refer to the tort action that they have already brought against the MEO. *Id.* at 28-29; *see also Greenberg v. Gulino* (C.C.P. Phila., No. 220601515). In the Parents' view, the "facts adduced during the course of this case demonstrate that [the MEO] was aware or became aware that [the Victim] could not have killed herself, but chose to conceal that information from the family and the Estate, who have incurred substantial financial and emotional costs in uncovering the truth." Parents' Br. at 29. The

---

[15] Act of June 29, 1953, P.L. 304, *as amended*, 35 P.S. § 450.810.

28

Parents conclude that their interest in that litigation gives them "every right to seek intervention by the courts to correct the [MEO's] arbitrary abuse of discretion." *Id.*

We cannot agree with the Parents' arguments. It must be reiterated that the Parents have brought the instant action in their capacity as Estate administrators. If the death certificate's impact on other litigation confers standing on the Parents in this matter, that litigation would have to involve harm to the Estate. Yet, any financial or emotional injuries caused by the MEO's purported misconduct in this case would have to be sustained by the Parents themselves. As explained previously, there is no indication in the record, nor do the Parents specifically allege, that the Estate's finances have been impacted by the MEO's determination. Furthermore, the Estate cannot experience emotional harm, as it represents a deceased person.[16] The Parents' tort claim against the MEO does not support their argument, because they have initiated that action in their personal capacity as well as in the Estate's behalf. Indeed, the Complaint's single count in that case alleges intentional infliction of emotional distress, on the ground that the MEO's conduct has caused

---

[16] In previous filings, the Parents have identified several forms of alleged harm. In their Complaint, the Parents aver that the "negative consequences" of the MEO's conduct are "far reaching," impacting the Victim's "family members, the vital statistics registration system in the Commonwealth and United States, and the basic goals of our system of criminal justice and accountability." R.R., Item No. 4(b), Complaint ¶ 5. The Parents further explain that "our society stigmatizes suicide," which "deprives surviving family members of the closure and peace of mind to which they are otherwise entitled." *Id.* ¶ 56.

It should be noted that none of the above forms of harm indicate any form of injury to the Estate that our law recognizes. As discussed above, this Court has held that the purported stigma of suicide is insufficient to confer standing. *Nader*, 643 A.2d at 753. Regarding the concern for criminal justice, vital statistics, or other areas of public policy, the Parents do not explain how their or the Estate's interest is any more substantial than the general "interest of all citizens in procuring obedience to the law." *Markham*, 136 A.3d at 140; see also *Pittsburgh Palisades Park, LLC v. Com.*, 888 A.2d 655, 660 (Pa. 2005) (explaining that the standing inquiry requires a party to show a "peculiar, individualized interest . . . that is greater than that of" citizens generally) (emphasis added).

29

the *Parents* to suffer "severe emotional distress." *Greenberg v. Gulino* (C.C.P. Phila., No. 220601515), Compl. § 251. Thus, whatever potential impact the death certificate may have in that case does not confer standing in this matter.[17]

**F. The Death Certificate's Impact on Present and Future Litigation**

Finally, we have found no legal support for the Parents' assertion that the manner of death identified on the death certificate would be dispositive of any future legal proceeding. As our Supreme Court has held, the finding of a MEO "is *merely advisory* to the public authorities charged with the administration of the criminal law. It is only a preliminary investigation and not a trial on the merits. *Its finding is binding on no one as a judgment*." *Com. ex rel. Czako v. Maroney*, 194 A.2d 867, 868 (Pa. 1963) (emphasis added). As a consequence, prosecuting authorities are free to pursue criminal charges regardless of the conclusion stated on a death certificate. *See*, *e.g.*, *Com. v. Tallon*, 387 A.2d 77, 83 (Pa. 1978) (affirming a voluntary manslaughter conviction notwithstanding the coroner's death certificate attributing the victim's death to natural causes). Moreover, as the Trial Court aptly noted, "there is no guarantee that the [PPD], the [DAO], or the [OAG] will reopen the case or pursue [the Victim's] killer," even if the death certificate were amended. Trial Ct. Op., 6/8/2022, at 7-8 (unpaginated).

There is no question that death certificates *may* have evidentiary value in civil or criminal proceedings. Yet, that value's high degree of variability renders the

---

[17] Assuming *arguendo* that the death certificate had a definite impact on the outcome of the Parents' tort action, it is unlikely to support a showing of standing in the instant matter, because that action was initiated on June 15, 2022, nearly three years after the Complaint was filed here. This Court has held that standing "is determined by the facts that exist at the time the complaint is filed." *Ramos v. Allentown Educ. Ass'n* (Pa. Cmwlth., No. 150 M.D. 2016, filed Dec. 21, 2016), slip op. at 5; *see also* Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a) (providing that we may cite an unreported opinion for its persuasive value).

asserton of standing even more speculative. To conclude that the Parents' interest is direct and immediate, we would need to assume not only the viability of future litigation, but also the evidentiary weight that a future trier of fact would give to the manner of death stated on the death certificate. There is no reliable means of making that determination, particularly when the Parents would also be free to show the trier of fact their evidence of the flaws in the MEO's conclusions.

The mere possibility that future events might occur that could affect a party is insufficient to establish the direct and immediate interest required for standing. *Ams. for Fair Treatment, Inc. v. Phila. Fed'n of Teachers*, 150 A.3d 528, 536 (Pa. Cmwlth. 2016). In this case, even if there were an action that the Parents could pursue as Estate administrators, the causal connection between the alleged conduct and the outcome of that litigation is too tenuous to render the Parents' interest direct or immediate. *See William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 283 (Pa. 1975) (noting that "the possibility that an interest will suffice to confer standing grows less as the causal connection grows more remote").

## IV. Conclusion

The facts surrounding this matter are extremely disturbing and the Parents' tireless efforts over the past 12 years to learn exactly what happened to their daughter on the evening of January 26, 2011, warrant our sincere sympathy. The experts they enlisted have all raised serious factual questions about Dr. Osbourne's and Dr. Gulino's conclusions, and even the MEO now concedes that there "*is no dispute that evidence in the record could support other conclusions about the manner of death*." MEO's Reply Br. at 1 (emphasis in original).

31

We emphasize that our ruling expresses no conclusions about the underlying merits of the Parents' causes of action.[18]  Rather, our conclusion is limited to the purely legal question of whether the Parents, as administrators of the Victim's Estate, have an interest in the outcome of this litigation that is substantial, immediate, and direct in order to establish standing.  We must pose that question because it is not our role to "render decisions in the abstract or offer purely advisory opinions"; rather, we may only intervene "when the underlying controversy is real and concrete."  *Stilp v. Com.*, 927 A.2d 707, 710 (Pa. Cmwlth. 2007).  Because the Parents' assertions of standing fail as a matter of law, we are compelled to conclude that the Trial Court erred in denying the MEO's Motion.  Accordingly, we reverse the Trial Court's order and remand for the entry of judgment in the MEO's favor.

_____
ELLEN CEISLER, Judge

Judge Wallace did not participate in the decision of this case.

---

[18] Because we hold that the Parents' lack of standing is dispositive of this matter, we need not reach the second issue for which this Court granted interlocutory appeal: "Is mandamus and/or declaratory relief available to compel revision of a medical examiner's opinion as to the manner of death stated on a death certificate?"

32

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Marlon Osbourne, M.D. and the    :
City of Philadelphia Office of the   :
Medical Examiner,             :
          Appellants      :
                      :
      v.                :   No. 1461 C.D. 2021
                      :
Joshua M. Greenberg and Sandra  :
Greenberg, Administrators of the   :
Estate of Ms. Ellen R. Greenberg  :

# **O R D E R**

AND NOW, this 13th day of September, 2023, the October 21, 2021 Order of the Court of Common Pleas of Philadelphia County (Trial Court) in the above-captioned matter is hereby REVERSED. The case is remanded to the Trial Court for the entry of judgment in favor of Marlon Osbourne, M.D., and the City of Philadelphia Office of the Medical Examiner.

Jurisdiction relinquished.

_____
ELLEN CEISLER, Judge

Marlon Osbourne, M.D. and the : 
City of Philadelphia Office of the : 
Medical Examiner, : 
            Appellants : 
             : 
         v. :   No. 1461 C.D. 2021
             : 
Joshua M. Greenberg and Sandra : 
Greenberg, Administrators of the : 
Estate of Ms. Ellen R. Greenberg :   Argued: November 15, 2022


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE LORI A. DUMAS, Judge

## *OPINION NOT REPORTED*

DISSENTING OPINION
BY JUDGE McCULLOUGH                      FILED: September 13, 2023


Because I believe Joshua M. Greenberg and Sandra Greenberg, as administrators of their daughter, Ellen R. Greenberg's (Decedent) estate (Estate), have standing to seek a court-ordered revision of the manner of death listed on Decedent's death certificate, I would affirm the trial court.

Standing to bring a suit is a prerequisite for a person to obtain a judicial resolution of a dispute. It is well established that for a person to have standing, he or she must be aggrieved by the matter being challenged. *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269 (Pa. 1975); *Nader v. Hughes*, 643 A.2d 747 (Pa. Cmwlth. 1994). "Aggrieved" is defined as having an immediate, direct, and substantial interest in the challenged matter beyond the interest of an individual member of the general public. *Citizens for State Hospital v.*

*Commonwealth*, 553 A.2d 496 (Pa. Cmwlth. 1989). The party must demonstrate a "sufficiently close causal connection between the challenged action and the asserted injury to qualify the interest as 'immediate' rather than 'remote.'" *William Penn Parking Garage*, 346 A.2d at 286.

Unlike the Majority, I believe the Estate has demonstrated a sufficiently close causal connection between the Medical Examiner's Office's (MEO) refusal to amend Decedent's death certificate and the Estate's inability to seek mandatory monetary compensation, and its corollary ability to seek civil redress for Decedent's death.

First, because suicide is not a crime, Decedent has been deprived of her status as a victim, thereby denying her Estate the ability to seek or obtain criminal restitution or other compensation to which it would be entitled under Section 1106(a) of the Crimes Code, 18 Pa. C.S. § 1106(a) (Restitution Statute). An estate stands in the shoes of the victim under the Restitution Statute, and it is the "victim" within the meaning of that statute. *Commonwealth v. Hall*, 80 A.3d 1204, 1213 (Pa. 2013); *Commonwealth v. Biauce*, 162 A.3d 1133, 1139 (Pa. Super. 2017); *Commonwealth v. Lebarre*, 961 A.2d 176, 180 (Pa. Super. 2008). Decedent, as the direct victim of a crime causing injury to her person, is entitled to mandatory restitution from her assailant(s) upon his or her conviction. 18 Pa. C.S. § 1106(a) ("Upon conviction for any crime wherein . . . the victim, if an individual, suffered personal injury directly resulting from the crime, the offender shall be sentenced to make restitution in addition to the punishment prescribed therefor.").

The Estate has established that the only impediment to the investigation and prosecution of Decedent's murder is her death certificate, which, despite all the evidence, still designates her manner of death as suicide. MEO's refusal to correct

Decedent's death certificate has precluded the prosecution and conviction of Decedent's assailant(s) and, consequently, deprived the Estate of a tangible benefit available to crime victims. The amendment of the death certificate to reflect homicide as the manner of death would pave the way to a new investigation and prosecution of Decedent's murderer(s). Thus, the Estate has a direct and immediate interest in seeing that impediment lifted, thereby freeing the authorities to conduct another, more thorough investigation, prosecution, and conviction of Decedent's murderer(s), which would entitle the Estate to restitution under the Restitution Statute.

The erroneous death certificate also precludes the Estate from obtaining civil damages under the Wrongful Death Act. Wrongful death actions are governed by 42 Pa. C.S. § 8301. Under the Wrongful Death Act, an action for the death of an individual "caused by the wrongful act or neglect or unlawful violence or negligence of another" may be brought to compensate the individual's spouse, children, or parents for pecuniary losses sustained by them. 42 Pa. C.S. § 8301(a), (b); *Sinn v. Burd*, 404 A.2d 672, 675 n.3 (Pa. 1979); *Machado v. Kunkel*, 804 A.2d 1238, 1245 (Pa. Super. 2002); *Sunderland v. R.A. Barlow Homebuilders*, 791 A.2d 384, 390 (Pa. Super. 2002); *Hodge v. Loveland*, 690 A.2d 243, 246 (Pa. Super. 1997). An action for wrongful death may be brought by the personal representative of the decedent for the benefit of those persons entitled by law to recover damages for such wrongful death. Pa.R.Civ.P. 2202(a).

Here, the Estate's interest is direct and immediate, as a murder conviction would affect the ability of the Estate to bring a wrongful death suit as well as its outcome.

I must also dissent from the portions of the Majority Opinion that conclude the Estate's interest in a potential wrongful death action is insufficient to confer standing because the two-year statute of limitations ran on January 26, 2013. The Majority is correct that the discovery rule is inapplicable to a wrongful death action. *See Anthony v. Koppers Company, Inc.*, 436 A.2d 181 (Pa. 1981). **However, the doctrine of fraudulent concealment, which does apply to wrongful death actions**, provides that a defendant may not invoke the statute of limitations where, "through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Krapf v. St. Luke's Hospital*, 4 A.3d 642, 650 (Pa. Super. 2010). *See also Fine v. Checchio*, 870 A.2d 850 (Pa. 2005); *Nesbitt v. Erie Coach Co.*, 204 A.2d 473 (Pa. 1964); *Molineux v. Reed*, 516 Pa. 398 (1987); *Gravinese v. Johns-Manville Corp.*, 471 A.2d 1233, 1238 (Pa. Super. 1984). This doctrine is broad and encompasses both intentional fraud and unintentional deception. The plaintiff carries the burden of proof and must show fraudulent concealment by "clear, precise, and convincing evidence." *Krapf*, 4 A.3d at 650. Unlike the discovery rule, the doctrine of fraudulent concealment may extend to actions taken by a defendant after the date of death. (*See, e.g.*, *Krapf*, where the plaintiffs relied on death certificate issued by the defendant after the decedents' death).

In a wrongful death action, the murderer(s) should be precluded from raising the statute of limitations because he/she has, in effect, by concealing his/her identity, and not coming forward and admitting to the crime, has foreclosed the Estate's ability to identify him/her within the statute of limitations. I submit that, applying the fraudulent concealment doctrine, where a wrongful death claim is based on murder, the statute of limitations begins to run on the date the victim's survivors

discover, or should have discovered, that the defendant has been convicted and sentenced for the murder. Otherwise, until a conviction is secured, there would be no way for an estate of a murder victim to know who to sue for wrongful death, and it would be unfairly precluded from bringing a wrongful death action unless the murderer is brought to justice within six months of the victim's death. *See Nicole B. v. School District of Philadelphia*, 237 A.3d 986, 995 (Pa. 2020) (equitable tolling is a malleable, policy-driven concept taking into account principles of justice and fairness for both the party who seeks delay of the running of the limitations period and the party who is protected by the statute of limitations).

Finally, the Majority, relying on *Nader*, holds that a claim of societal stigma of suicide is insufficient to confer standing to seek revision of the manner of death on the death certificate. However, I do not agree that *Nader* is applicable here. *Nader* is distinguishable because (1) the Estate's claim is not one based solely on removing the stigma of suicide; and (2) the father in *Nader* did not argue that he had standing based on his inability to seek mandatory monetary compensation, or civil redress for his son's death, as the Estate argues here. Unlike in *Nader*, the Estate has established that a correction from suicide to homicide would have palpable consequences on its ability to obtain restitution under the Restitution Statute and civil damages under the Wrongful Death Act. In that respect, *Nader* does not involve the same issues or nuances at play here, *i.e.*, allegations that a corrected certificate of death to homicide would be the catalyst for opening a criminal investigation into Decedent's suspicious death and untether the Estate's right to receive recompense for Decedent's death.[1] Rather, the father in *Nader* based his standing argument only

---

[1] Authorities are duty-bound to investigate a murder and, to the extent an assailant is found, prosecute. *See* Philadelphia, Pennsylvania, The Philadelphia Code § 5-200 (providing the duty of
**(Footnote continued on next page…)**

on the fact that he "suffered extreme personal grief, stress, and anguish," and that he and his family were injured in that they had "suffered from the blatant stigma that [his son] committed suicide." *Id.* at 753. Here, as set forth above, the Estate has argued more than just the stigma of suicide as the basis for establishing its standing.

For the above reasons, I would conclude that the trial court did not err when it found that the Estate has standing to litigate the current matter and, therefore, I respectfully dissent.

_____
PATRICIA A. McCULLOUGH, Judge

---

the Police Department shall be to prevent and detect crime and to enforce within the City the statutes and ordinances of the Commonwealth and City, respectively); *see also* The Philadelphia Code § 1402 (providing the duty of the District Attorney to conduct criminal prosecutions in the name of the Commonwealth). These duties are triggered, in this instance, by MEO, whose duty it is to investigate deaths and determine whether there exists sufficient reason to believe the death resulted from "a criminal act of a person other than the deceased." The Philadelphia Code § 1218-B(b).